**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**PARKLANE HOSIERY CO., INC. and Herbert N. Somekh, Defendants.**

**No. 76 Civ. 2024.**

United States District Court, S. D. New York.

Nov. 9, 1976.

As Amended Nov. 10, 1976.

William D. Moran, Regional Administrator, New York Regional Office, S. E. C., New York City, for plaintiff by Donald N. Malawsky, Associate Regional Administrator, Franklin D. Ormsten, Asst. Regional Administrator, Harry L. Garmansky, Nadine S. Liebhardt, New York City, of counsel.

Jacobs Persinger & Parker, New York City, for defendants by Irving Parker, Joseph N. Salomon, David R. Birk, New York City, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

This action is brought by the Securities and Exchange Commission (hereinafter "SEC" or "the Commission") against Parklane Hosiery Co., Inc. and Herbert N. Somekh under Section 17(a) of the Securities Act of 1933, 15 U.S.C. 77q(a) and Sections 10(b), 13(a) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m(a) and 78n(a) and the various rules promulgated thereunder. The SEC has moved this Court for a preliminary injunction against the ongoing violations and for ancillary relief to remedy those which it claims have already occurred. Rule 65, Fed.R.Civ.Proc.

Both parties have requested that the hearing on the preliminary injunction be consolidated with the trial of this action. Rule 65(a), Fed.R.Civ.Proc. That request is granted. This opinion will constitute findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.Proc.

The facts are relatively simple. The defendant, Herbert N. Somekh, was the guiding force behind the expansion of the corporate defendant Parklane Hosiery Co., Inc. which has approximately 400 retail outlets selling various articles of women's apparel.

At some point during December 1968, shares in Parklane Hosiery Co., Inc. were offered to the public pursuant to a complete registration with the SEC. Somekh, however, retained effective control of the corporation in that he and others affiliated with him owned 71.6 per cent of the stock. Apparently, after the public offering the price of the shares advanced, or at least remained firm, but with the recession which occurred thereafter, the price of the public shares was drastically reduced. The decision was made by Somekh and his affiliates to have the corporate defendant "go private" by purchasing the public shares. The mechanics of this was to have Somekh and those associated with him, transfer their shares to a new corporation called "New

PLHC Corp." which would also attempt to obtain the outstanding public shares and eventually merge with the corporate defendant, thus eliminating the public shareholders. New PLHC Corp. effectively made the tender for the public shares. Proxy material was circulated which stated that there would be a meeting of the shareholders of the corporate defendant on October 14, 1974 for the purpose of considering and acting upon "a proposal to approve and adopt a plan of merger between the company and New PLHC Corp. pursuant to which the company will become a privately held company, and each outstanding share of common stock of the company (other than shares owned by New PLHC Corp.) will be exchanged for $2 in cash . . . ." The proxy statement also indicated that the dissenting shareholders had the right to appraisal under the New York Business Corporation Law.

The SEC's complaint is that the proxy statement did not go far enough in disclosing that the true underlying purpose of having Parklane Hosiery Co., Inc. go private was to bail out Herbert Somekh from certain personal transactions. The Commission also alleges that the proxy material was inadequate in that it failed to reveal that the corporate defendant was actively engaged in attempting to negotiate the release of a lease in lower Manhattan to the Federal Reserve Bank of New York, which release could have produced sizeable cash flow to the corporation. It is further charged that these facts were not disclosed to the appraisers. The Commission also seeks injunctive relief for the failure of Parklane Hosiery Co., Inc. to file certain 10–K reports and that certain other quarterly and annual reports which were filed were false and misleading in that they did not adequately disclose the purposes of the defendants in going private and the Federal Reserve Bank negotiations.

The SEC contends that Somekh and Parklane should now be enjoined:

". . . it is requested that this Court (i) enjoin defendants Parklane and Somekh from further violations of the antifraud, proxy, and reporting provisions of the federal securities laws, (ii) order the appointment of a Special Counsel armed with all necessary powers and authority to make a determination as to the proper value of Parklane's stock, and as to the proper mode and extent of relief to be afforded former public Parklane shareholders, (iii) order Parklane to amend its prior public filings with the Commission so as to correct and adequately disclose all material matters relating to Parklane's financial and other affairs, (iv) order the defendant Parklane to file a Form 10K for the year ending September 30, 1975, and (v) order any other relief as to this Court shall deem necessary and appropriate."

Before considering the factual issues presented, it is helpful to note that this action is but one of five now pending regarding the Parklane-New PLHC merger. Although the information provided to me regarding the other actions is at best sketchy, it appears that a private action under Rule 10b–5 is now pending before Judge Wyatt of this Court, *Shore v. Parklane Hosiery Co., Inc.*, 74 Civ. 4986, a class action in the Eastern District of New York, a class action in New York Supreme Court and an appraisal proceeding in Nassau County Supreme Court. It must also be noted that the SEC has not sought to challenge the act of going private as a per se violation of Rule 10b–5. *See Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283 (2d Cir. 1976), *cert. granted*, —— U.S. ——, 97 S.Ct. 54, 50 L.Ed.2d 74 (1976); *Marshel v. AFW Fabrics Corp.*, 533 F.2d 1277, *judgment vacated for possible mootness*, —— U.S. ——, 97 S.Ct. 228, 50 L.Ed.2d 162 (1976).[1]

---

1. It is entirely possible that the Commission's decision not to challenge the merger on this ground is based upon concern over the continued viability of these cases in light of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct.

1375, 47 L.Ed.2d 668 (1976). This Court has been advised that one or more of the private actions do raise this attack. In any event, the case was not tried on that theory and my decision does not hinge thereon.

## I. SOMEKH'S PERSONAL INDEBTEDNESS

Thomas E. Baggott, a vice-president of Bankers Trust Company, testified that sometime in 1971 the bank made a loan of $750,000 to Parklane Hosiery and a two year personal loan to Mr. and Mrs. Somekh of $900,000. The collateral for the personal loan consisted of the stock in Parklane held by Mr. and Mrs. Somekh, assignment or mortgaging of certain real estate, and assignment of other securities and negotiable instruments. Baggott testified that the collateral package exceeded $2 million.

Sometime in late 1971 or early 1972, Mr. Somekh made a payment in the amount of $80,000. No other payment was ever made and no attempt was made by the bank to foreclose on the collateral. On several occasions, Baggott urged Somekh to reduce the outstanding balance. Although Mr. Somekh met with bank officials to discuss selling certain of his properties, no such sales took place.

From January 1974 through that summer, Bankers Trust persisted in seeking a reduction of the outstanding balance. By March, an informal understanding had been reached that Somekh would sell off a mortgage note from the Rite-Aid Company and obtain a mortgage on his home in order to repay Bankers Trust. Although a buyer was found for the Rite-Aid mortgage, the arrangement fell through, apparently due to practical and legal problems associated with the closing.

While repayment requests were being made by Bankers Trust, the National Bank of North America stepped up efforts to obtain payment from Somekh on a guarantee obligation in the amount of $150,000. Somekh and three others had personally guaranteed a demand loan to a real estate partnership, 433 JV, of which each was a member. The bank had unsuccessfully sought repayment from Harold Strauss, one of the partners, in July 1973 and from Somekh in February 1974. On May 15, 1974, the bank wrote Somekh informing him that repayment was being demanded as of May 24, 1974, and that failure to repay by that date would result in legal action.

During the same period of time, Somekh had a demand note outstanding with First National City Bank (FNCB) in the amount of $125,000. This loan was called in as of July 2, 1974. Since no payment was made an action was commenced in New York Supreme Court on September 20, 1974, Index No. 14881-1974.

Pressed with repayment demands, Somekh began to consider having Parklane go private. Somekh testified that he first gave thought to going private in late June or early July of 1974. About a month later, he began serious discussions with his attorneys, regarding the advisability and feasibility of such a course.

In or about August 1974, Baggott, Fried, another bank official, Somekh, and Somekh's accountant, had a meeting at which Somekh indicated that he intended to bring Parklane private as an alternative means of liquidating the personal obligation. These plans were reiterated to Baggott at a September 5th meeting with Somekh.

The proxy statement was issued as of September 24, 1974. On October 14, 1974 the merger converting the company to privately owned status took place.

Following the merger, at a December 30, 1974 meeting, Somekh's salary was increased from $90,000 to $150,000, retroactive to October 1973.[2] The Board authorized the corporate officers to purchase a parcel of land owned by Somekh in Pennsauken, New Jersey, and his interest in a limited partnership known as Riverbend Development Associates. The properties were purchased from Somekh for $1.2 million.

Baggott testified that he began to receive payments from Somekh after the merger. A $70,000 payment was made on December 6, 1974. A $150,000 payment was received on December 31st. Thereafter, payments

---

2. Although this action had originally been approved at a September 16, 1974 meeting of the Executive Committee of Parklane, no mention of it is made in the proxy statement.

**482**

of $25,000 a month were received until December 1975, when the remaining balance of $355,000 was paid.

As to the outstanding indebtedness to FNCB, an agreement was reached on December 6, 1974 whereby Somekh would pay the sum of $4,000 a month until the loan was fully repaid. The National Bank of North America dispute was resolved by a $50,000 payment by Somekh sometime in November 1974.

The Commission contends that the proxy material inadequately discloses Somekh's true intention in proposing the merger: to bail out his personal financial situation. The defendants assert that the proxy statement does adequately disclose these facts and point to a paragraph under the section heading "Purpose and Background of Proposed Merger":

> "If the proposed merger is consummated, the shareholders of Newco will be entitled to the benefit of all the assets, earnings, earning capacity and cash flow of the Company. The merger will make possible a combination of the resources of the Company with those of Mr. Somekh (who with his wife and trusts for the benefit of his children, owns approximately 86% of the stock of Newco) for the conduct of real estate activities of the type that Mr. Somekh has to date conducted individually (primarily development of garden apartments). Such a combination is presently being contemplated."

█ It is clear to me that the overriding purpose for the merger was to enable Somekh to repay his personal indebtedness. Had his finances been otherwise, the merger may never have occurred. There is not so much as a hint of Somekh's huge debts in the proxy statement. The non-disclosure is clearly established. The importance of this information to a shareholder, *i. e.,* its materiality, is a separate question which will be considered at a later point in this opinion.

## II. NEGOTIATIONS WITH FEDERAL RESERVE BOARD OF NEW YORK

The Commission has also alleged that the proxy material misrepresents the status of discussions concerning cancellation of a lease of property by Parklane from the Federal Reserve Board of New York (hereinafter "FRB"). Specifically, it is claimed that the assertion in the proxy statement that as to the FRB lease "there are no negotiations at present" is false and misleading as to a material fact.

Parklane had leased a parcel of land on the southeast corner of John and Nassau Streets in New York City from the FRB. The land was, in turn, subleased to a franchisee of Parklane and to a third party, Jo-Ray Foods, Inc.

The FRB was in the process of constructing a building on that block and hired Robert S. Curtiss of Ely-Cruikshank Co., Inc. to negotiate a termination of the lease which had a natural expiration date of December 31, 1978. Curtiss testified that discussions with Parklane representatives began sometime in 1968 or 1969. Early on in the negotiations the FRB made an offer of $500,000; a later, January 1970 proposal, included finding new locations for the subtenants. By May 16, 1974, the FRB made a ten day offer of $800,000 to Parklane which would cover Parklane's interest and that of the sub-tenants.

The apparent stumbling block to a conclusion of the deal was the sub-tenant, Jo-Ray Foods. It had demanded at first $1,200,000, later $800,000, for cancellation of its interests alone. In June 1974, this demand was reduced to $600,000. Seizing on this change of position, Somekh made a June 27 counter-offer to the FRB of $1,200,000, which broke down into an allocation of $600,000 to Jo-Ray, $300,000 to the franchisee, and $300,000 to Parklane; the offer by its terms expired July 10, 1974.

On July 1, Curtiss wrote to Somekh indicating his own disappointment with the

June 27 offer but indicated that it would be submitted to the FRB. The FRB did not make any effort to accept the offer before its July 10, 1974 deadline.

No significant activity transpired until October 4, 1974, when Curtiss telephoned Somekh to arrange a luncheon meeting at the Wall Street Club concerning the leasehold situation. Curtiss testified that he and Somekh indicated their mutual desire to "get it resolved." Somekh reiterated his position that $1,200,000 would be necessary to close the deal. Curtiss indicated to Somekh a change in his original opinion as to the merits of his proposal and that he would now be willing to recommend the $1,200,000 figure to the FRB. Somekh agreed to accept $300,000 as Parklane's share of the deal and to attempt to obtain assurances from Jo-Ray and the franchisee. On October 7, 1974, Curtiss wrote to William F. Treiber of the FRB recommending the Somekh offer.

No amendment was made to the proxy statement following the October 4 meeting. In determining whether the proxy material is false and misleading when it indicated that "there are no negotiations at present," an examination of the correspondence of the two parties to the October 4 meeting is revealing.[3] In his October 7 letter to Treiber, Curtiss prefaced his report with the following comment:

"Without now reviewing steps taken in this extended negotiating process as events have been reported to you, I present the current status following a long conference with Mr. Somekh previous to meeting with you last Friday afternoon October 4th."

On October 29, Somekh wrote to Baggott to advise him of his progress with respect to the FRB situation:

"Also, and again this is off the record since until I have the money in my hand, I don't want to say that I have any deals, but I have had several conversations with the Federal Reserve and it seems that we may be heading towards a deal that would net Parklane $300,000 that can close around the end of the year. I am keeping my fingers crossed since I realize what this would mean so let's both hope it gets done."

I find that the October 4 conference between Somekh and the authorized representative of the FRB falls within the common usage of the term "negotiation."[4] Thus, the unamended proxy material was false when it stated that "there are no negotiations at present." The materiality of the FRB negotiations will be discussed at a later point.

## III. THE APPRAISAL

The third area in which the Commission alleges a failure to disclose facts which are material relates to the appraisal conducted by Thomson & McKinnon, Auchincloss and Kohlmeyer, Inc. (hereinafter "Thomson & McKinnon"). Peter A. Russ, who was a vice-president of Thomson & McKinnon during the events in issue, testified that Somekh had retained the firm around August 12, 1974 to appraise the Parklane shares in connection with the merger.

Russ indicated that three techniques were used in valuing the shares: first, the net worth and assets of the company were evaluated; second, the general industry outlook was analyzed and on that basis future earnings were estimated; and third, a cash flow evaluation was made. The final appraisal, although dated August 29, 1974, was submitted September 3. It valued the stock at $1.78 per share.

Russ testified that at the time he conducted the appraisal he was not told and was not aware of Somekh's plans to use nearly $1 million of corporate assets to reduce his personal indebtedness. He was

---

3. Of course, the characterizations by Curtiss are not binding on Somekh or Parklane but they do constitute some evidence of what in fact occurred.

4. See Webster's New Twentieth Century Dictionary (unabridged Second Ed. 1970) defining negotiation as "a conferring, discussing, or bargaining to reach an agreement as in business transaction or state matters."

equally unaware of Somekh's intention to sell real property to the corporation. At no time was Russ, or anyone else at his firm, informed of the negotiations with the Federal Reserve Board with respect to cancellation of the leasehold at Nassau and John Streets.

█ The Commission asserts that the proxy statement is misleading when it sets forth the fact of an appraisal by Thomson & McKinnon but fails to disclose that the appraisal was based upon inadequate and incomplete information. While such a claim would logically fall within Rule 10b–5, I do believe that Rule 14a–9 is broad enough to encompass the claim. The failure to inform Thomson & McKinnon of these facts and the failure to disclose the defect in the appraisal in the proxy statement is beyond question.

IV. MATERIALITY

Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) prohibits the solicitation of proxies through the use of the mails or means or instrumentalities of interstate commerce unless the solicitation is in compliance with the rules and regulations of the Commission. Pursuant to that authority the SEC has promulgated Rule 14a–9 which provides in part:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication written or oral, containing any statement, which, at the time and in the light of circumstances under which it was made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading . . . ."

I have already concluded that the proxy statement distributed by Parklane contains at least one misstatement and two omissions, but the inquiry does not end there.

The Supreme Court has recently emphasized the importance of demonstrating that the false or omitted facts be truly material. The Court noted that too low a standard of materiality may result in liability for insignificant non-disclosures and encourage offerors to bury the shareholder in "an avalanche of trivial information" so as to avoid liability. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The standard set forth by the Court requires more than speculation as to the importance of the misleading or omitted fact:

"The general standard of materiality that we think best comports with the policies of Rule 14a–9 is as follows: an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills* general description of materiality as a requirement that 'the defect have a significant *propensity* to affect the voting process.' It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

*Id.* at 449, 96 S.Ct. at 2133 (footnote omitted).

A determination of what a reasonable shareholder would consider important is more difficult where the proposed shareholder action is an acquisition of an ongoing business and the misstatement or omission relates to the attributes of the acquiring or target companies. There, a shareholder must decide whether the acquisition will enhance his investment. The distinction

between what a single shareholder might subjectively consider important and that which would likely influence a reasonable shareholder can be subtle.

■ In the case before me, resolution of this question is simpler. Since the number of shares held by Somekh's family and associates were such that the merger and resulting elimination of public shareholders could not possibly be thwarted, the sole question facing a minority shareholder was whether to accept the $2.00 per share price or to pursue his rights as a dissenting shareholder in an appraisal proceeding. If the shareholder is only called upon to evaluate the fairness of the per share offering price, then any omission or misstatement of fact which would affect the offering price must be material under the *Northway* test. Anything which would affect the price, upward or downward, would necessarily be important to the shareholder in making this decision. Proceeding one step further, an omitted or misstated fact which would have a *substantial* likelihood of affecting the price would, therefore, have a *substantial* likelihood of being considered important.

At trial, Russ testified that had he known that approximately $1 million in corporate assets would be used to reduce Somekh's indebtedness, it would have affected the appraisal. Specifically, the company was evaluated solely in the specialty retail area and without consideration of a possible change in its liquidity through land acquisitions. Russ also indicated that had he known of the FRB negotiations, it would have prompted further inquiry. The possibility of a transaction which would have netted the company $300,000 would have affected his appraisal in terms of his evaluation of cash flow. Russ testified that the fact that Parklane was merely negotiating with the FRB would not have excluded it from consideration in the appraisal.

As previously mentioned, the offering price was $0.22 higher than the Thomson &

McKinnon appraisal. At the August 29, 1974 meeting of the Board of Directors of Parklane, Somekh proposed the $2.00 per share price. Stanley D. Robinson, an outside director, felt the price was inadequate and suggested between $2.50 and $3.00 per share. The minutes reflect that in supporting the $2.00 price, Somekh emphasized the Thomson & McKinnon appraisal.

■ Regardless of the degree of influence that the Thomson & McKinnon appraisal had on the final offering price, this Court has been presented with expert testimony, through Russ, which indicates that the omitted and misstated information bears directly upon one's ability to ascertain the fair value of the shares. Since I find that the omitted information would have had a substantial likelihood of affecting the price of the stock, a reasonable shareholder would have considered it important in deciding whether to vote to accept the $2.00 per share price or pursue his appraisal remedy.

In finding materiality as to the FRB negotiations, I am mindful of the fact that evaluation of the importance of the non-disclosure of an anticipated event requires: ". . . a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Here, however, there is an affirmative misstatement rather than a non-disclosure. Had there been no falsity involved, the situation might have been different.[5]

At first glance, misstatements regarding a transaction which could at most net the corporation $300,000 might appear to be of doubtful materiality. *See SEC v. Bausch & Lomb, Inc.*, 420 F.Supp. 1226, at 1235 (S.D. N.Y.1976). But in gauging their significance in terms of shareholder action, it

---

5. Although Curtiss testified that negotiations continue to the present day, it must be noted that the FRB deal has never been concluded. This, of course, does not necessarily affect the materiality of the misstatement. Once Parklane learned that the SEC was investigating these negotiations, it is entirely possible that it chose not to close the deal.

must be kept in mind that the net earnings per year for the entire Parklane "empire" for the five years preceding the merger never exceeded $533,000.

In regard to the information withheld from Thomson & McKinnon, a minority shareholder who is faced with the task of evaluating the fairness of the per share price offered by the majority will place great weight upon an independent appraisal as revealed in the proxy statement. If that appraisal was conducted based on faulty or insufficient information, the shareholder is in a worse situation than if no appraisal were made or disclosed. He may be lulled into believing he has a valuable tool when in fact he has a meaningless nothing. When the omissions and misstatements heretofore outlined are viewed in terms of what truthful information has been disclosed, I come to the conclusion that these deficiencies are material.

## V. RELIEF

■ Congress has authorized the SEC to seek injunctive relief "[w]henever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule or regulation thereunder . . . ." 15 U.S.C. § 78u(e). In demonstrating the need for injunctive relief, the SEC is not required to show the same likelihood of irreparable harm which would be required from a private litigant. *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir. 1975). *Cf. SEC v. Bausch & Lomb, Inc., supra.* But in the final analysis general equity principles do

6. I am not unmindful that often delays in SEC proceedings are caused by the difficulties of investigation, the myriad documents to be examined, and the prime consideration of the staff and of the Commission of the rights of possible defendants. The case cited, for example, is one which I can personally attest reflects all of these factors. I am sure that the case at bar most likely tracks the same care and consideration.

7. Counsel for the petitioners in the appraisal proceeding has indicated to this Court that substantial progress has been made:

control and establishing the wrong will not necessarily establish the right to the requested relief. 515 F.2d at 807. *See SEC v. Geon Industries, Inc.,* 531 F.2d 39, 56 (2d Cir. 1976).

■ As noted in the introduction to this opinion, the SEC has requested, *inter alia,* the appointment of a special counsel to determine the fair value of the Parklane shares and for an injunction against future violations by defendants. In this regard I find it significant that a year and a half has elapsed from the date of the violation to the Commission's request for injunctive relief. The delay belies the claim of pressing need for the relief. *See SEC v. Keller Industries, Inc.,* 342 F.Supp. 654, 660 (S.D.N.Y. 1972) (Gurfein, J.).[6]

■ To appoint a special counsel for the purpose of determining the fair value of the Parklane shares is to assume that the appraisal proceeding pending in New York Supreme Court will fail in its effort to arrive at a just and equitable price. I will not make such an assumption. Counsel for the SEC has suggested that a special counsel could be empowered to determine and pay out the difference between the true fair value and that paid to the shareholders who did not dissent. In light of the three other private actions, which are separate and apart from the appraisal proceeding and this case, I find relief of that nature to be wholly unnecessary.[7] The appointment of special counsel, receiver or trustee is a useful remedial tool, but this is not the proper case for it. See *SEC v. Shapiro,* 494 F.2d 1301, 1309 (2d Cir. 1974); *SEC v. S & P National Corp.,* 360 F.2d 741, 750 (2d Cir.

"The hearings before Appraiser Fink have extended for nearly a year, including discovery. Nearly 2,700 pages of transcript and 140 exhibits already have been introduced in evidence on the question of the fair value of the stock at the time Parklane went private. Extensive testimony relating to the work of Parklane's auditors is in the record, as well as testimony by its principal officers."
May 11, 1976 letter of A. Wisehart and F. Cuccia.

1966); *see also* Proceedings of the Conference of the North American Securities Administrators, 1972, at pp. 95–96.

■ Turning to the request for an injunction against future violations, the "critical question" is whether "there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972). While "the commission of past illegal conduct is highly suggestive of the likelihood of future violations," the "totality of circumstances" must be examined. *SEC v. Management Dynamics,* 515 F.2d at 807. Herbert Somekh is not a securities broker or dealer. Apart from his role in Parklane, his involvement with the securities market has been as an investor. While I do believe his violation of Section 14(a) and that of his company were knowing thus meeting the statutory requirements, I also feel that it was an isolated occurrence. No one has suggested to me that there was any impropriety connected with the 1968 public offering or any other securities transaction in which Somekh or Parklane were involved. An injunction is intended to prevent further violations and not to punish for those that have already occurred. *SEC v. Geon Industries, Inc.,* 531 F.2d at 56. Accordingly, I see no need for an injunction against future violations as to Somekh.

Parklane is directed to amend its prior filings with the SEC to correct the misstatements and non-disclosures referred to in this opinion. If Parklane has not yet filed its Form 10K for 1975, it is ordered to do so. All other requested relief is denied.

SO ORDERED.