Frances GLUCK, Plaintiff,

v.

Charles A. AGEMIAN, Lawrence B. Buttenweiser, Allen B. Ecker, Jay Emmett, Steven J. Ross, Eugene R. Black, Emanuel Gerard, Salim L. Lewis, Martin D. Payson, David H. Horowitz, Caesar P. Kimmel, Jacob S. Liebowitz, Bess Meyerson, Edward Rosenthal, Andrew J. Frankel, Morton A. Sweig, Paul A. Milstein and Warner Communications, Inc., Defendants.

No. 79 Civ. 81–CSH.

United States District Court,
S. D. New York.

July 16, 1980.

Garwin & Bronzaft, New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Agemian, Emmett Ross, Black, Gerard, Lewis, Horowitz, Kimmel, Liebowitz & Rosenthal.

Gold, Farrell & Marks, New York City, for defendant Warner Communications, Inc.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendants Frankel & Sweig.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant Milstein.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This is a shareholder's derivative action brought against individuals comprising the Board of Directors of defendant Warner Communications, Inc., and others, alleging violations of § 10(b) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, and breaches of certain fiduciary duties imposed on corporate directors under state law. Jurisdiction is invoked under § 27 of the Act, 15 U.S.C. § 78aa, and principles of pendent jurisdiction. Various of the defendants move to dismiss the complaint for failure to state a federal claim under § 10(b) and Rule 10b–5, and lack of subject matter jurisdiction as to the pendent state law claims. Because plaintiff has submitted and the Court has considered matters outside the pleadings, the motion shall be treated as one for summary judgment under Rule 56, F.R.Civ.P. For the reasons set forth below, summary judgment dismissing the first cause of action for failure to state a claim is granted. With the pre-trial dismissal of the federal claim at the pleading stage, I decline to retain pendent jurisdiction of the state law claims, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); there being no independent jurisdictional basis, the state law claims are likewise dismissed.

### I.

Accepting the factual allegations of the complaint as true,[1] the litigation arises out of the following circumstances.

1. The facts are not, in any event, disputed by the defendants. *See* Memorandum of the Warner Directors at 5–10.

Plaintiff, a New York citizen, is and has been since prior to 1972, the owner of shares of stock of defendant Warner Communications, Inc. ("Warner" or "WCI"). Warner, a Delaware corporation with its principal place of business in New York, is engaged in the entertainment and communications industry; its stock is traded on the New York and American Stock Exchanges.

Until September 1971, National Kinney Corporation (Kinney) had been a wholly-owned subsidiary of Warner. In September 1971, Kinney made a public offering of its common stock, and simultaneously sold to Warner some 140,000 shares of common stock in return for cancellation of $2,170,000 of Kinney debt to Warner. As a result of these transactions Warner retained 48.9% ownership of Kinney common stock and 100% ownership of Kinney convertible preferred stock.

In October 1971, Warner sold 140,000 shares of Kinney common stock; 40,000 shares to each of three Kinney officers—defendants Frankel, Sweig and Milstein—and 20,000 shares to a fourth officer, one Arthur E. O'Donnell. The purchase price was $15.50 per share; each of the four officers paid $.50 per share at the time of sale and gave Warner a promissory note for the balance of the purchase price. The notes were payable on October 1, 1976, or six months after the death of the officer, or 30 days after the termination of his employment with Kinney, whichever event first occurred. The notes bore interest at a rate of 4% per annum; Warner retained the 140,000 shares as collateral.

Between November 1973 and October 1976 each of the four promissory notes fell due; during this time Kinney common stock traded at substantially lower prices than the $15.50 per share at which it had been sold to the four Kinney officers. Warner's Board of Directors failed to take legal action to collect the promissory notes; rather, Warner took steps under the Uniform Commercial Code to retain the 20,000 shares representing the collateral on the O'Donnell note and extended to September 30, 1977, allegedly without consideration, the due dates on the Frankel, Sweig and Milstein notes, which represented a $1.8 million debt owed Warner.

The foregoing facts were alleged in a shareholder's derivative action brought by this plaintiff against a virtually identical cast of defendants, alleging violations of § 7 of the 1934 Act, 15 U.S.C. § 78g, various Federal Reserve Board Regulations, and state law. Judge Brieant dismissed the federal causes of action for failure to state a claim, and declined to retain jurisdiction over the pendent claims, essentially because state law provided the traditional remedies for the alleged waste and spoilation of corporate assets. *Gluck v. Frankel*, 440 F.Supp. 1143 (S.D.N.Y.1977).

Plaintiff thereafter instituted a second derivative action in New York State Supreme Court, in December 1977, alleging breaches of fiduciary duties in connection with the Warner Board's actions respecting the promissory notes. *Gluck v. Frankel, et al*, Index No. 15546/78 (Sup.Ct.N.Y.Cty.).

The crux of plaintiff's instant allegations of federal securities fraud concern not the transactions recited above, but rather events which transpired subsequently. In the latter part of 1978, Warner owned 47%, or some 3 million shares of Kinney common stock, and 100%, or 1.5 million shares of its convertible preferred stock, the latter convertible into 3 million shares of common stock; these holdings allegedly constituted 57% voting control of Kinney. Sometime in 1978, defendants Frankel and Sweig (Kinney's principal officers and directors) and defendant Milstein (a former Kinney officer and director) formed a general partnership (FMS Associates) to acquire Warner's interest in Kinney. On December 19, 1978 Warner and FMS Associates entered into an agreement for the purchase and sale of Warner's Kinney stock; the transaction was meant to close at the same time the agreement was executed. Two days later, on December 21, 1978, Warner caused the following press release to be published in the Wall Street Journal:

" 'NATIONAL KINNEY STAKE IS SOLD BY WARNER COMMUNICATIONS INC.

'NEW YORK—Warner Communications Inc. said it sold its 57% interest in National Kinney Corp. for $1 million in cash and notes and received an additional $7.2 million cash as repayment of debts National Kinney owed Warner.

'Warner is a diversified entertainment company. Kinney has interests in building maintenance, parking lots and construction services.

'The buyer of Kinney interest is a partnership of two principal officers and a former officer of Kinney. They are Andrew J. Frankel, chairman and chief executive officer; Morton Sweig, president and formerly vice chairman, and Paul Milstein, former president who is president and chief operating officer of United Brands Co. Mr. Milstein said he wouldn't be active in Kinney's day-to-day management.

'In addition to receiving $8.2 million, Warner said it had been released from all guarantees of National Kinney's indebtedness, totaling about $10 million, and had received another $1.8 million in cash as payment of debts owed Warner by Messrs. Frankel, Sweig and Milstein.

'National Kinney said it had arranged a refinancing and four-year extension of its bank debt. A new credit agreement with Manufacturers Hanover Trust Co. and four other banks covers a $29 million revolving credit maturing in January 1985, Kinney said.' "[2]

Some two weeks after the Wall Street Journal article appeared, plaintiff filed the instant suit, alleging in respect of her federal securities fraud claims:

"34. The sale of the shares to the partnership comprised of Frankel, Sweig and Milstein for $1,000,000 in cash and notes, was part of a conspiracy to free the WCI Board members of their personal liability in the New York State Action and to relieve Messrs. Franek [sic], Sweig and Milstein of their aggregate $1,800,000 indebtedness to WCI.

"35. Defendants, with the intent to mislead WCI's shareholders concerning the underlying facts of the sale of shares to the partnership, disseminated to the news media materially false and misleading information concerning the sale."

\*　　\*　　\*　　\*　　\*　　\*

"37. The December 21, 1978 Wall Street Journal article was materially false and misleading because it failed to disclose: "(a) that the purchase price was in fact $2,800,000 for the shares;

"(b) that the purported payment of $1,800,000 to WCI to pay the indebtedness of Frankel, Sweig and Milstein, rather than as payment of the purchase price of the shares, was done to relieve members of the WCI Board of their personal liability for failing to sue defendants Frankel, Sweig & Milstein for the $1,800,000;

"(c) that the transaction was designed to enable Frankel, Sweig and Milstein to avoid the payment of the $1,800,000 on the promissory notes, by allocating $1,800,000 from the purchase price to the promissory notes; and

"(d) that the repayment of the $7,200,000 and the release of WCI from the guarantees of NKC's loans were independent transactions which were not dependent upon the purchase of WCI's shares of NKC stock by the partnership." [3]

In her submissions in response to the instant motions plaintiff adds a further contention:

"In addition to the aforementioned allegations in the complaint, the December 21, 1978 Wall Street Journal article failed to disclose that the cash and notes of $1,000,000 was, in actuality, cash of $250,000 and a note for $750,000 due December 19, 1983 and that the note could be satisfied only with the assets of the partnership, if any, and not with the assets of the individual partners." [4]

Plaintiff's pendent state law claims allege waste and spoilation of corporate assets as a

---

**2.** Complaint, ¶ 36.

**3.** *Id.,* ¶¶ 34, 35, 37.

**4.** Affidavit of Bruce E. Gerstein at ¶ 5.

result of (1) the inadequate purchase price received from FMS Associates for Warner's Kinney stock in the 1978 transaction; and (2) the Warner Board's failure to secure a fair rate of interest on the 1971 promissory notes.[5]

## II.

At the heart of this case is plaintiff's attempt to transmogrify a perfectly viable state law claim for breach of fiduciary duty into one for federal securities fraud under Rule 10b–5. The attempt perforce must fail.

■ In its landmark decision in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court rejected the notion that "the term 'fraud' in Rule 10b–5 [brought] within the ambit of the Rule all breaches of fiduciary duty in connection with a securities transaction" or "that a breach of fiduciary duty . . . without any deception, misrepresentation, or nondisclosure, violates the statute and the Rule." *Id.* at 472, 476, 97 S.Ct. at 1302. The *Green* Court adhered to the view that " 'Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.' " *Id.* at 479, 97 S.Ct. at 1304 (quoting *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971)). Claims of fraud and fiduciary breach state

a 10b–5 cause of action "only if the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Id.* 430 U.S. at 473–74, 97 S.Ct. at 1301. The Court of Appeals has construed *Green* to mean: "If . . . full and fair disclosure was made, [plaintiff] could not predicate [a] federal claim upon an asserted breach of [defendants'] state-law fiduciary duties." *Rodman v. Grant Foundation*, 608 F.2d 64, 70 (2d Cir. 1979).

■ Two theories of 10b–5 liability adverted to by the *Green* Court may be disposed of. First, there is no suggestion that the Warner Board's conduct was manipulative, as that term was construed by the Supreme Court. *See* 430 U.S. at 476–77, 97 S.Ct. at 1302. Second, plaintiff insists that the case is brought under the first and third clauses of Rule 10b–5, not the second. Nowhere is it contended that the Board's failure to give *advance* notice of the sale to FMS Associates constituted a material nondisclosure. Nor is it suggested that because such disclosure as was made occurred two days after the sale, plaintiff was lulled into inaction or lost equitable remedies available under state law. *Id.* at 474 n. 14, 97 S.Ct. 1301 n. 14 (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see also, Goldberg v. Meridor*, 567 F.2d 209, 218–20 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).[6]

5. In respect of this latter claim defendants state that:
"The validity of this original [1971] transaction [respecting the promissory notes] has been judicially approved, pursuant to a settlement in *Bilsky v. Kimel*, Civil No. 4220 (Del.Ch. New Castle Co.), a shareholders' derivative suit in Delaware commenced in 1973 and resolved in 1975. Insofar as plaintiff (Cplt. ¶ 46) appears to challenge the original transaction or the original interest rate on the Notes, such claim is barred by *res judicata*." Warner Directors' Memorandum at 6. I intimate no view on this issue.

6. The only reference to advance disclosure in the pleadings and submissions is made in connection with plaintiff's discussion of transaction causation:
"Defendants contend that the complaint fails to allege that the deception of Warner's shareholders (the December 21, 1978 Wall Street Journal article) was 'in connection

with' the sale because it was purportedly after the consummation of the sale. . . .
" . . . Even assuming arguendo, the article was after the consummation of the sale, the deception of Warner's shareholders was alleged to be a necessary element in a plan and scheme to defraud Warner and its shareholders. . . ."
"In addition to the omissions from the Wall Street Journal article, the directors, who had a conflict of interest, had the affirmative duty to truthfully disclose all material facts pertaining to the sale of Kinney stock to the partnership. Failure to fully disclose to the shareholders the true facts of the sale prior to the consummation of the sale would also establish the causation element." Plaintiff's Memorandum at 6–8.
As this discussion makes clear, plaintiff's focus is not the timing of the press release but rather on its substance. In plaintiff's view, it is the defendants' failure to disclose "the true

Standing alone, paragraph 34 of the complaint alleges no more than internal corporate mismanagement and actions constituting a breach by the Board of its fiduciary duties. As such, it fails to state a federal claim. The crucial and necessary allegation of deception is made in paragraph 35. Plaintiff's theory is that the disclosure that was made in the December 21, 1978 press release was false and misleading—that it constituted a deception on the corporation and its shareholders—because it omitted and misstated material facts respecting the transaction. *See generally, Goldberg v. Meridor, supra.* The contention does not withstand analysis.

Plaintiff has seen fit to submit a copy of the December 19, 1978 purchase and sale agreement to which is annexed the form of promissory note given by FMS Associates.[7] A reading of these documents reveals that the disclosure made by the Warner Board fully and fairly described the transaction with FMS Associates, and neither omitted nor misstated material facts.

Under the agreement, the purchase price for the shares was in fact $1 million payable in cash and notes. These facts were accurately stated and plaintiff points to no authority which would require disclosure of the precise ratio of cash to notes, or the terms under which the notes were payable or collateralized. There is simply no theory under which this disclosure can be deemed material, in the sense of "assum[ing] actual significance in the deliberations of the reasonable shareholder" or "significantly alter[ing] the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

The fact that Warner received a separate payback of the FMS Associates partners' debt of $1.8 million was disclosed. Whatever plaintiff's views on the adequacy of the

consideration or the propriety of the transaction, the fact remains that under the agreement the purchase price was $1 million; the additional $1.8 million payment eliminated the partners' debt to Warner. These facts were truthfully revealed.

Moreover, the Board was not required to disclose what plaintiff contends to have been its base motives in structuring the transaction in this particular fashion—its alleged desire to avoid an altogether speculative liability which may have resulted from plaintiff's own state court action, and an attempt to enable the FMS Associates partners to "avoid" payment of their debt to Kinney. The securities laws require the disclosure of facts, not "the confession of selfish motives." *Rodman, supra,* 608 F.2d at 70–71 (quoting *Doyle v. Milton,* 73 F.Supp. 281, 286 (S.D.N.Y.1947)); *see also, e. g., Lewis v. Oppenheimer,* 481 F.Supp. 1199, 1204 (S.D.N.Y.1979); *Stedman v. Storer,* 308 F.Supp. 881, 887 (S.D.N.Y.1969).

The District Court's opinion in *Rodman, supra,* 460 F.Supp. 1028, 1037–39 (S.D.N.Y. 1978), discusses the authorities on this point in some detail. I am of the view that this case falls within the purview of those decisions holding that the disclosure of subjective motive is not required under the federal securities laws. The only contrary authority is the Second Circuit's decision in *SEC v. Parklane Hosiery Co., Inc.,* 558 F.2d 1083 (2d Cir. 1977). There the statement is made that "had the shareholders of Parklane been aware of Somekh's reasons for the going private transaction, they, or others, might well have been able to enjoin the merger under New York law as having been undertaken for no valid corporate purpose. *See People v. Concord Fabrics, Inc.,* 83 Misc.2d 120, 371 N.Y.S.2d 550 (Sup.Ct. 1975), *affirmed,* 50 A.D.2d 787, 377 N.Y.S.2d 84 (App.Div. 1st Dept., 1976). . . .

facts of the sale" which subjects them to 10b–5 liability. In any event, even on the theory of materiality discussed in *Green* and *Goldberg* (*i.e.* that disclosure enables shareholders to move against the transaction) the timing of that disclosure is of little consequence under New York law, at least where, as here, it swiftly follows consummation of the transaction. This is so because § 720 of

the New York Business Corporation Law (McKinney 1963 & 1979–80 Supp.), permits a shareholder action "(2) To set aside an unlawful conveyance, assignment or transfer of corporate assets . . . " as well as to enjoin such proposed action.

7. Affidavit of Bruce E. Gerstein at Exhibit A.

This case involves a failure to disclose when the non-disclosed information could have been used by the minority shareholders to attempt to enjoin the merger. The purpose for the merger was, therefore, relevant." 558 F.2d at 1088. This language squares with neither the District Court's findings and conclusions in the *Parklane* case, nor with subsequent interpretations given *Parklane* by the Second Circuit.

To be sure, Judge Duffy, in his *Parklane* opinion, 422 F.Supp. 477 (S.D.N.Y.1976), concluded that the proxy statement at issue, which was given to minority shareholders in connection with a going private "freeze out" merger, was materially false and misleading, because it failed to disclose, *inter alia*, "that the overriding purpose for the merger was to enable Somekh [the controlling shareholder] to repay his personal indebtedness . . . [and] [t]here is not so much as a hint of Somekh's huge debts in the proxy statement." *Id.* at 482. However, an analysis of Judge Duffy's opinion reveals that the nondisclosure was deemed material *not* because it failed to reveal a selfish purpose for the merger, but rather because "had [the appraiser] known that $1 million in corporate assets would be used to reduce [the personal] indebtedness, it would have affected the appraisal. Specifically, the company was evaluated solely in the specialty retail area and without consideration of a possible change in its liquidity through land acquisitions." *Id.* at 485. By way of background, once the corporation had gone private, it purchased from the controlling shareholder two real estate interests in return for $1.2 million in cash. Judge Duffy found that the control group's ownership was such that the merger could not be thwarted; thus, the sole question facing a minority shareholder was whether to accept the buyout price or pursue an appraisal proceeding. With respect to materiality Judge Duffy concluded that the nondisclosure was actionable because the information, likely to affect the buyout price offered for the stock, would have been important to the shareholders in deciding whether to accept the offered price rather than seek an appraisal remedy; moreover, the failure to reveal to the appraisers the

plan for disposal of the corporate assets, rendered their appraisal (on which the buy-out price was based and on which the shareholders were likely to rely) suspect.

Judge Duffy neither relied on, nor even mentioned, the theory of materiality suggested by the Second Circuit. In construing *Parklane*, Judge Pollack, in *Rodman, supra*, wrote: "The District Court held, and the Court of Appeals agreed, that failure to disclose Somekh's personal debts was a material omission. But neither Court decided whether disclosure of Somekh's debts, but not of his actual purpose to use the corporation's assets to pay them, would have sufficed." 460 F.Supp. at 1038. The *Rodman* panel on appeal apparently agreed with this analysis. In ruling that a disclosure of motive was not required, the Court stated that *Parklane* was "not to the contrary. There, the 'overriding purpose' for a going-private scheme was to enable the president and principal shareholder of the company to discharge his personal debts from the company treasury, *and* there was 'not as much as a hint' *of these debts* in the proxy statement. [558 F.2d] at 1086." 608 F.2d at 71 n.5 (emphasis added). Thus, it was the fact of the debt, rather than the purpose for the transaction, which was crucial in determining materiality.

Applying this analysis to the instant case, I conclude that the failure to reveal what plaintiff sees as the Board's true motive for selling the Kinney stock is not actionable. In the first place, the individual directors' liability for their actions respecting the notes was altogether speculative—no "debt" existed; and the fact that the buyers' debt on the notes was relieved as an incident of the transaction was fully disclosed. Unlike *Parklane*, where the preexisting debts were concealed and the objective fact of Somekh's intention could be made out by his pre- and post-merger activities, here the Board's supposed motive is and will remain entirely subjective. Judge Frankel's reasoning in *Stedman v. Storer, supra*, 308 F.Supp. at 887, is fully applicable here:

"But it is bemusing, and ultimately pointless, to charge that directors perpetrated

a 'material omission' when they failed to (a) discover and adjudge faithless motives for their actions and (b) announce such a discovery in reporting the products of their managerial efforts and judgment. The securities laws, while their central insistence is indeed upon disclosure, were never intended to attempt any such measures of psychoanalysis or reported self-analysis. The unclean heart of a director is not actionable, whether or not it is 'disclosed,' unless the impurities are translated into actionable deeds or omissions both objective and external. Cf. *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969); *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), cert. denied, *Coates v. Securities and Exchange Comm.*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)."

Whatever the motive of the Warner Board, its translation into actionable deed was disclosed.

Carrying the *Parklane* dictum to its logical conclusion would suggest that a 10b–5 suit could be constructed whenever a shareholder, displeased with its corporation's securities transaction, alleged an improper subjective motive on the part of the directors. Since the potential for injunctive relief against actions taken without valid corporate purpose would always exist, the failure to disclose motive would always be relevant. Rather than spawning 10b–5 litigation on such a tenuous basis, the more sensible rule, it seems to me, is one which requires disclosure of the material facts of the transaction, not the subjective motive behind it. Once the facts are disclosed, the shareholder can make a meaningful assessment of the fairness of the transaction and pursue claims of underlying fiduciary transgressions in state court. The securities laws are not meant "to federalize the sub-

stantial portion of the law of corporations that deals with transactions in securities." *Green, supra*, 430 U.S. at 479, 97 S.Ct. at 1304. Accordingly, I conclude that in the circumstances of this case, where the objective facts of the sale to FMS Associates were fully and fairly reported, liability cannot be premised on the Warner Board's failure to reveal its purported underlying subjective motive for the transaction.

The remaining two items alleged in the complaint require little discussion. Plaintiff does not allege that the statement that Warner received $7.2 million as repayment of the Kinney debt was inaccurate; the press release merely disclosed the fact that this debt was repaid. And Warner's release from its guarantees of Kinney's indebtedness was in fact a condition to its obligations under the purchase agreement.

In sum, I conclude that defendants made adequate and accurate disclosure of Warner's transaction with FMS Associates, and the dissolution of its various relationships with Kinney. Having done so, the "fundamental purpose" of Rule 10b–5 "implementing a 'philosophy of full disclosure,'" *Green*, 430 U.S. at 478, 97 S.Ct. at 1303, was satisfied. While plaintiff may have legitimate grievances respecting the transaction, they are a matter of state concern and regulation. On the basis of the information provided, shareholders were in a position to make an informed decision as to the fairness and adequacy to Warner of the transaction and to seek redress against the Board which is available under state law. *Id.* at 474, 97 S.Ct. at 1301. Indeed, the very disclosure which is attacked here furnished the information on which this shareholder instituted this suit, not two weeks later. Absent nondisclosure or misleading disclosure, there is no viable federal securities fraud claim in the circumstances of this case.[8] *Goldberg, supra*, 567 F.2d at 221; *Rodman, supra*, 608 F.2d at 72.

---

8.  In light of the disposition reached herein, it is unnecessary to dwell on the additional reasons offered in support of the motions to dismiss. Suffice it to say that I find defendants' arguments respecting transaction causation, arising from the "in connection with" language of Rule 10b–5; the purchaser/seller standing requirement; and the need to plead fraud with particularity, Fed.R.Civ.P. 9(b), to be without merit. *See generally, Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (causation); *Goldberg v. Meridor*, 567 F.2d 209, 217–18 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct.

Accordingly, I conclude that plaintiff has failed to state a claim under § 10(b) of the 1934 Act and Rule 10b–5; and I decline to retain jurisdiction over the remaining state law claims. Defendants' motion to dismiss the complaint is granted; plaintiff remains free to pursue in state court a remedy for the wrongs she has alleged. The Clerk is directed to enter summary judgment in favor of defendants dismissing the complaint.

It is So Ordered.

1249, 55 L.Ed.2d 771 (1978) (causation); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 381 (2d Cir. 1974) (causation); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 738–39, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (citing *Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir. 1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969)) (shareholder derivative standing when corporation purchases or sells securities).