927 F.2d 667
 Fed. Sec. L. Rep. P 95,819
Ira L. MENDELL, on behalf of himself and others similarly
situated, Plaintiffs-Appellants, Cross-Appellees,
v.
George J. GREENBERG, Frederick R. Adler, James R. Swartz,
Anita Loehmann Stafford, Donald H. Balleisen, Allan S.
Gordon, Christopher D. Illick, Cecily C. Selby, Kenneth J.
Thornhill, John D. Mack, AEA Investors Inc., LHI Inc., LH
Investors, Inc., LH Holdings Inc., Loehmann's Inc., and
Drexel Burnham Lambert Incorporated, Defendants-Appellees,
Cross-Appellants.
 Nos. 532, 725, Dockets 89-7718, 89-7760.
 United States Court of Appeals,
Second Circuit.
 Submitted Jan. 10, 1990.
Decided Nov. 1, 1990.
Amended Opinion March 7, 1991.
 
 David C. Birdoff, New York City (Neil G. Sparber, Fulbright Jaworski & Reavis McGrath, New York City, of counsel), filed a brief for defendants George J. Greenberg, Frederick R. Adler, James R. Swartz, Allan S. Gordon, Christopher D. Illick and Cecily C. Selby.
 Arnold S. Klein, New York City (Lisa K. Eastwood, Kelly Drye & Warren, New York City, of counsel), on the brief for defendants AEA Investors Inc., LHI Inc., LH Investors Inc., LH Holdings Inc., and Loehmann's Inc.
 Robert W. Brundige, Jr., New York City (Hughes Hubbard & Reed, New York City, of counsel), on the brief for defendants Anita Loehmann Stafford and John D. Mack.
 Irving Malchman, New York City (Kaufman Malchman Kaufmann & Kirby, New York City, of counsel), filed a brief for plaintiff-appellant Ira L. Mendell.
 Before: VAN GRAAFEILAND, CARDAMONE and ALTIMARI, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 Sixty years ago in 1930 Charles Loehmann founded what later became a chain of women's clothing stores offering customers high quality clothing at prices below those of many upscale department stores. When Mr. Loehmann who held the largest block of the company's stock died in 1977, and his widow, Anita T. Loehmann, died three years later, their daughter, Anita Loehmann Stafford, became the fiduciary of the estates. She sought to sell the Loehmann family's holdings. Divestment of the stock came by way of a merger in January 1981 with a subsidiary of defendant AEA Investors, Inc. (AEA).
 
 
 2
 Plaintiff Ira L. Mendell, a shareholder of Loehmann's Inc. common stock at the time of its merger, thereafter brought an action under Sec. 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 of the Securities and Exchange Commission alleging that shareholder approval of the merger was obtained by means of a materially misleading proxy statement issued on December 9, 1980. Most of the claims of misrepresentation were dismissed by the district court in Mendell v. Greenberg, 612 F.Supp. 1543 (S.D.N.Y.1985) (Mendell I ), for failure to state a claim upon which relief could be granted. Plaintiff appeals the dismissal of one claim in Mendell I and two claims that the district court initially refused to dismiss in Mendell I--but subsequently dismissed in Mendell v. Greenberg, 715 F.Supp. 85 (S.D.N.Y.1989) (Mendell II ).
 
 
 3
 When a corporation issues a proxy statement it must not contain any false or misleading statements respecting any material fact, or omit stating material facts necessary to make the statements in it not false or misleading. SEC Rule 14a-9(a), 17 C.F.R. Sec. 240.14a-9(a). We deal on this appeal with both mandates. A proxy statement should honestly, openly and candidly state all the material facts, making no concealment of the purposes for the proposals it advocates. Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed; the others were concealed. Consequently, we affirm the judgment appealed from in part, and reverse and remand in part.
 
 BACKGROUND
 
 4
 A. The Loehmann Family's Decision to Sell Their Stock
 
 
 5
 Plaintiff first alleges that at the time of the AEA merger the Loehmann family sought a prompt sale of its Loehmann's stock because it needed cash to pay estate taxes. Mendell believed that Anita Loehmann Stafford (Stafford) had a conflict of interest when she gave her support in the proxy statement to the proposed merger at a price of $31.30 a share. Mendell claims Stafford--as a representative and beneficiary of the largest shareholder of Loehmann's and as a company director--had the ability to persuade the other directors and shareholders to approve the transaction. In making this allegation Mendell relied upon the following facts to indicate that family financial pressures rather than what was best for Loehmann's was the paramount purpose in the recommendation of the merger proposal to the shareholders.
 
 
 6
 It was conceded by defendants that the taxes due upon the estates of Charles and Anita Loehmann exceeded their liquid assets by millions of dollars. To resolve the problem Stafford had two options: have the estate taxes paid over a 15-year period, with only the interest due for the first five years and the principal payable in subsequent ten annual installments, pursuant to I.R.C. Sec. 6166 (1988), or sell off a substantial portion of Loehmann's stock to raise funds.
 
 
 7
 Prior to the deaths of Charles and Anita Loehmann the family had considered selling its holdings. In the mid-1970s offers from three potential bidders, including AEA, had been considered, and though a sale was never consummated, negotiations had brought it close. In 1977 Anita Loehmann had retained Drexel Burnham, Lambert, Inc. (Drexel) to locate a purchaser because she was dissatisfied with corporate management. Drexel was unable to come up with an offer from the companies it contacted.
 
 
 8
 Later, Stafford called upon Drexel to find a purchaser, expressing an interest in selling the family holdings alone or in conjunction with a sale of the entire company. Stafford's financial advisers had suggested that she diversify the estates' assets, and that the family's shares would command a higher price were they to be sold as a block. Stafford rather surprisingly stated that the advisers never told her that the stock had to be sold to raise funds for the estate taxes.
 
 B. The Sale to AEA and the Proxy Statement
 
 9
 Stafford's intention to sell the family's holdings was disclosed in a Schedule 13D filing made with the SEC in May 1980. When AEA learned from Drexel that the Loehmann family was interested in selling, AEA entered into negotiations to purchase the entire company. No other offers surfaced. On September 25, 1980 a merger agreement in principle was approved by Loehmann's Board of Directors and the December 9 proxy statement expressing the Board's approval of the merger and recommending it to the stockholders of Loehmann's described its terms.
 
 
 10
 Mendell's appeal concerns alleged misstatements and omissions in the proxy statement. He alleges that the proxy statement failed to inform the shareholders of the Loehmann family's large estate tax liability, and that Stafford's purpose in recommending the merger which, Mendell charges, offered shareholders a price for their stock well below its true value was to discharge this debt. Mendell asserts that a shareholder could reasonably have inferred from these facts that Loehmann's was being sold because the Loehmann family needed to raise cash rather than because it was in the shareholders' best interests.
 
 
 11
 Mendell's second contention is somewhat connected to the first one. He states that the Loehmann family expected to realize a substantial savings in the amount of estate taxes due the Internal Revenue Service if it were able to pay the taxes immediately rather than on the deferred basis provided in Sec. 6166 of the Internal Revenue Code. He asserts that had the family elected to pay the estate taxes on a deferred basis it would have obtained only an 8.1 percent blockage discount on the value of its stock, but if the taxes were paid in full immediately, a blockage discount of about 30 percent was available. According to Mendell, the higher discount amounted to a net after-tax savings of $1,135,000 or $2.46 per share of the estate's stock. Such a substantial benefit accruing to the major shareholder of the company--one that did not accrue to any of the smaller shareholders--Mendell believes should have been disclosed in the proxy statement, particularly since Stafford's recommendation to approve the merger may have influenced the decisions of the other shareholders.
 
 
 12
 Mendell's last two challenges involve post-merger arrangements between AEA and defendant George Greenberg, Loehmann's Chief Executive Officer. The proxy statement expressly stated that "[u]pon consummation of the Merger, Mr. Greenberg will continue as the President, Chief Executive Officer and a Director of the Company." Mendell asserts that certain incentive arrangements given to Greenberg and other remaining managers of the company after the merger were part of a secret "handshake agreement" made between Greenberg and AEA prior to the merger and were not disclosed in the proxy statement. He avers that Greenberg's post-merger purchase of stock in AEA's subsidiary, LH Investors, Inc. (LH Investors), was also arranged prior to the merger and was contrary to an indication in the proxy statement that "[n]either Mr. Greenberg nor any other present director or officer of the Company owns beneficially or will acquire an equity or debt interest in AEA, LHI, Holdings or [LH] Investors."
 
 C. Procedural History
 
 13
 In Mendell I the district court dismissed most of Mendell's claims as legally insufficient. It denied the motion to dismiss those claims relating to the Loehmann family's need to raise cash to pay the estate taxes, and the alleged pre-merger agreements between Greenberg and AEA to provide an incentive package and stock to Greenberg after the merger. Relying on Rodman v. Grant Foundation, 608 F.2d 64 (2d Cir.1979) and SEC v. Parklane Hosiery Co., 558 F.2d 1083 (2d Cir.1977), the trial court reasoned that the personal motivation of the Loehmann family for recommending the merger was not required to be disclosed so long as all of the material facts regarding their interests were revealed. The trial judge could not say as a matter of law that the disclosure of the facts surrounding the family's estate tax liability was not necessary to prevent the proxy statement from being misleading, and therefore, left that issue for a jury. 612 F.Supp. at 1553. In a subsequent opinion, the court granted plaintiff discovery of the true value of Loehmann's stock at the time of the merger because "if the Loehmann family approved the merger at a price far below the true value of the stock, this might tend to establish that the Loehmann family was under economic pressure to get cash...." Mendell v. Greenberg, 113 F.R.D. 680, 682 (S.D.N.Y.1987).
 
 
 14
 With respect to the agreements between AEA and Greenberg, the district court agreed that failure to reveal them--assuming they actually existed--might be misleading, and that a jury would need to determine whether such omissions were material. Because Mendell had failed to set forth adequate facts to demonstrate the agreements' existence, the district court granted him an opportunity to substantiate them through discovery. 612 F.Supp. at 1554.
 
 
 15
 In Mendell II the district court addressed Mendell's surviving claims, again on a motion for summary judgment. After considering the evidence Mendell had acquired through discovery, it found insufficient evidence to create any genuine issue of material fact, and therefore dismissed all of Mendell's remaining claims. Judge Sprizzo found that no reasonable jury could conclude that at the time of the merger the Loehmann family had an urgent need of cash to pay estate taxes because the deferral election under I.R.C. Sec. 6166 was available. Moreover, he found that Mendell's assertion that the Loehmann family had many incentives to sell all of its stock at once rather than piecemeal, including expectations of an estate tax windfall due to an increased blockage discount, "could not rationally support an inference that there was an urgent need for cash...." 715 F.Supp. at 87. The district court additionally held that regardless of whether there was in fact an urgent need for cash, there was no evidence showing that Stafford was ever informed of that need by her financial advisors. The court noted that defendants, on the other hand, presented affidavits and deposition testimony from Stafford and her advisers stating that she was never so informed. Thus, the trial court ruled that even had there been an urgent need for cash, no rational jury could find that Stafford was motivated by it to recommend the merger. Id.
 
 
 16
 The district court also re-examined Mendell's claim that the omission from the proxy statement of the substantial blockage discount which the Loehmann family allegedly expected to realize from the sale of all of its stock was materially misleading. It concluded, as it had previously in Mendell I, that the law does not require proxy statements to reveal that particular shareholders may have differing tax benefits flowing from a proposed merger so long as those benefits did not flow directly from the merger itself, but instead, were incidental to it. Id. at 88.
 
 
 17
 As to Mendell's claims of pre-merger agreements between Greenberg and AEA, the district court found that plaintiff had failed to present sufficient evidence to support a finding that there were any "so called 'handshake' agreements" between Greenberg and AEA regarding Greenberg's post-merger incentive package and purchase of LH Investors stock. The court stated that the post-merger purchase of LH Investors stock was not itself sufficient to show that the proxy statement was misleading in representing that Greenberg would not acquire an equity or debt interest in LH Investors. Specifically, the trial court observed that AEA had a policy of offering stock incentives to the management of its companies, and that this favorable offering to Greenberg after the merger was just as consistent with AEA's unilateral policy as with any inferred pre-merger agreement. It therefore held that plaintiff's burden of proof "cannot be sustained where there is no direct proof of a prior agreement and the only circumstantial proof of such an agreement is subsequent conduct consistent with what AEA had, pursuant to its regular policy, planned to do." Id.
 
 
 18
 Regarding the alleged pre-merger agreement to give Greenberg and other management employees incentive packages, including salary raises, the court found that the proxy statement gave sufficient notice that such additional incentive arrangements were anticipated and that there was no evidence supporting Mendell's contention that the precise details of the arrangements had been negotiated prior to the merger. Id. at 89. Finally, Judge Sprizzo denied defendants' motion for sanctions under Rule 11. He found that although Mendell's claims were subject to dismissal on summary judgment, they were not so lacking in a colorable basis as to warrant sanctions. Id. at 90. Mendell appeals from the dismissal of his claims. Defendants cross-appeal from the refusal in Mendell I to dismiss and from the denial of Rule 11 sanctions in Mendell II.
 
 DISCUSSION
 
 19
 We discuss the recommendation of merger, tax incentive, and handshake agreement claims, and then turn to the cross-appeal. Analysis begins with the statute and SEC Rules. Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78n(a) (1988), prohibits the solicitation of proxies in violation of the rules and regulations of the Securities and Exchange Commission. Plaintiff's claims rest on SEC Rule 14a-9(a), 17 C.F.R. Sec. 240.14a-9(a) (1989), that provides:
 
 
 20
 No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....
 
 
 21
 Liability under Rule 14a-9 requires the omission of a material fact which renders the proxy statement false or misleading. An omitted or concealed fact is material when "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). If a reasonable shareholder would have viewed disclosure of an omitted fact as having "significantly altered the 'total mix' of information made available" then that fact is material. Id. Because materiality is a mixed question of law and fact, it is a question especially well suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue. Id. at 450, 96 S.Ct. at 2133; GAF Corp. v. Heyman, 724 F.2d 727, 737 (2d Cir.1983).
 
 I Material Facts Regarding Merger
 
 22
 In Mendell I the district court found that perhaps there was a genuine issue as to whether those facts regarding estate tax liability were material to a reasonable shareholder. See 612 F.Supp. at 1553. But in Mendell II, after considering the evidence derived from discovery, the district judge found that "no reasonable juror could conclude that [when the proxy statement was issued] the Loehmann family had an urgent need for cash to pay estate taxes" and that "regardless of whether or not in fact there was an urgent need for cash there is absolutely no evidence that Mrs. Stafford was ever told of such a need." 715 F.Supp at 87.
 
 
 23
 The district court based this conclusion on the fact that the Loehmann family had the option of deferring estate taxes over a 15-year period under I.R.C. Sec. 6166. It dismissed as irrelevant Mendell's contentions that Stafford desired to sell the family's stock in one block to prevent erosion of the family's control over the company and to benefit from a larger blockage discount on the estate taxes.
 
 
 24
 It was error to dismiss plaintiff's claims regarding the merger. A proxy statement need not disclose the underlying motivations of a director or major shareholder so long as all the objective material facts relating to the transaction are disclosed. See Rodman, 608 F.2d at 71. The trial court (Mendell I ) relied on our decision in Parklane Hosiery, which held that a principal shareholder's personal indebtedness was the overriding purpose for initiating a going-private scheme and therefore constituted a material omission from a proxy statement. 558 F.2d at 1086, 1087-89. The concerns that led the district court to deny the motion to dismiss in Mendell I should have led it to the same result in Mendell II.
 
 
 25
 In Parklane, plaintiff, the Securities and Exchange Commission, charged that a proxy statement had material omissions. The contention was that defendant--the majority shareholder of a publicly held corporation facing large personal debts (like the Loehmann family)--chose to take the company private by repurchasing its publicly held stock. The proxy statement fully disclosed that going private would give defendant control of the company's assets, earnings, and cash flow, and make it possible for him to combine the resources of the new private company with his own. Nonetheless, we held that " 'the overriding purpose' for the going-private scheme was to enable [the defendant] to repay his personal indebtedness," id. at 1086, and that the nondisclosure of the defendant's large personal debts was a material omission from the proxy statement, id. at 1087-89.
 
 
 26
 Similarly, we think that the fact that the Loehmann family had incurred substantial estate tax liability is not so inconsequential as to allow summary judgment on the issue of materiality. Of this fact there is no mention or hint whatever in the proxy material submitted to the shareholders, yet a jury could conclude that "a reasonable shareholder would consider it important in deciding how to vote," TSC Indus., Inc., 426 U.S. at 449, 96 S.Ct. at 2132; or, to put it another way, a jury could find that disclosure of this omitted fact would have "significantly altered the 'total mix' of information made available" to the shareholder. Id. A reasonable shareholder made aware of this liability could deduce that the Loehmann family desired a "quick sale" for estate tax purposes, not because this, or any sale would be in the best interests of the company or shareholders. Further, this information could lead the stockholder to infer that the majority stockholder's urgent need for cash, coupled with the control such a stockholder is able to exercise over the affairs of the company, had caused the Board of Directors to endorse a sale below the stock's value, the financial appraisal contained in the proxy statement notwithstanding. The appraisal is of course an important source of information for use both in valuing the stock and in deciding how to vote; but the reasonable shareholder is entitled to rely on factors in addition to the appraisal--the "total mix" of information--in making these decisions. Only when the proxy statement fully and fairly furnishes all the objective material facts as to enable a reasonably prudent stockholder to make an informed investment decision is the federal purpose in the securities laws served. See Data Probe Acquisition Corp. v. Datatab, Inc., 722 F.2d 1, 5-6 (2d Cir.1983); Parklane Hosiery, 558 F.2d at 1086, 1087-89; Lessler v. Little, 857 F.2d 866, 875-76 (1st Cir.1988).
 
 
 27
 Rodman v. Grant Foundation does not compel a contrary conclusion. In Rodman, plaintiff, trustee of the estate of the bankrupt W.T. Grant Company, charged that a proxy statement favoring a stock buy-back plan contained a material omission because the defendant directors' " 'desire to entrench their control was the principal, if not the sole reason for the [stock] purchase program' and ... this was not disclosed to the shareholders." 608 F.2d at 70. In Rodman "the proposed actions of the company and their effect on stockholdings were fully disclosed." Id. at 71. Based, therefore, on the fact that the directors' alleged motivation for the proposal--their "obvious interest in corporate control"--would be apparent to any shareholder evaluating the proxy statement, we "[found] little merit in [the] argument that disclosure of the above-described motivation might have induced shareholders to vote against the [stock buy-back plan]." Id.
 
 
 28
 In this case, the fact that the Loehmann family had incurred substantial estate tax liability was not disclosed in the proxy statement; significantly, unlike Rodman, absent such disclosure, the Loehmann family's interest in a "quick sale" of the company was not the type of "obvious interest" that all stockholders who received the proxy statement could be charged with inferring from reading the statement. This fact was neither disclosed, nor inferable from what was disclosed, so the omitted information cannot be said to be non-material due to its obviousness. Moreover, as discussed above, a reasonable shareholder--fully informed of the majority shareholder's urgent need for cash--could consider that fact important in valuing the stock, and the shareholder's appraisal of the stock's value is obviously "important in deciding how to vote." TSC Indus., Inc., 426 U.S. at 449, 96 S.Ct. at 2132. We therefore hold that the motivation of a controlling shareholder for favoring a course proposed in a proxy statement must be disclosed when there is a substantial likelihood that its disclosure will have a significant bearing on a reasonable shareholder's assessment of the recommended course of action. Applying that test, there was enough evidence here for a rational jury to reach the conclusion that the omitted information "might have induced shareholders to vote against the [merger]," Rodman, 608 F.2d at 71, making its omission a material one for securities law purposes. See Data Probe Acquisition v. Datatab, 722 F.2d 1, 5-6 (2d Cir.1983) (what is required to be disclosed is all material objective facts relating to the transaction).
 
 
 29
 Contrary to the district court's conclusion, plaintiff need not allege that the immediate sale of the family's stock was the only way by which the family could meet its tax obligations. Plaintiff acknowledges that Stafford had the option of deferring full payment of the estate taxes over a 15-year period under I.R.C. Sec. 6166, but offers evidence to show that this option would have appeared financially undesirable compared to an immediate sale of the shares, even at a price below Stafford's appraisal of the true value of Loehmann's stock. This evidence included current interest rates--which it might be assumed Stafford had taken into account--and the history of the company's cash dividends. Mendell posited the reasonable assumption that the family would have relied on this information to reach the conclusion that even on a deferred basis it might not be able to pay the estate taxes without having to sell off a portion of its stock. Statements Stafford herself made to the IRS--as well as statements made by one of the estates' lawyers--indicate that the family was averse to selling off its stock piecemeal.
 
 
 30
 This evidence raises a genuine issue of material fact whether Stafford considered the deferral election so unacceptable that the need to raise cash to discharge this debt immediately became the overriding purpose for the merger. While it may be true that the deferral election was a feasible alternative, plaintiff has set forth sufficient facts to cast reasonable doubt on such an assumption. Consequently, resolution of this question should have been reserved for a jury. TSC Indus., 426 U.S. at 450, 96 S.Ct. at 2133; cf. Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985).
 
 
 31
 With respect to the alternative grounds relied upon--that plaintiff had failed to show that Stafford knew of any urgent need to raise cash--the district court's assessment of plaintiff's proof is clearly erroneous. One of the family's estate lawyers, James Pressly, sent Stafford a letter dated October 22, 1980--eight days prior to the Board of Directors' approval of the merger and over a month before the proxy statement was issued--informing her that the estate was short about $1.5 million of liquid assets needed to pay the estate taxes. The letter also described the estate's predicament in having to choose between taking the Sec. 6166 election and thereby losing a "shot at a large [blockage] discount" on the stock or declining the deferral election, thereby irrevocably losing that method of payment in the event that the proposed merger were to "blow up."
 
 
 32
 This letter makes it abundantly clear that Stafford knew prior to her vote as a director both that the estate had a shortage of liquid assets and that the consequences of using the deferral election were undesirable. At the least the letter creates a question of fact as to what Stafford knew when she voted for the merger. Further questions of fact exist regarding whether Stafford's influence on the board of directors was so great that the merger proposal was adopted in order to allow the Loehmanns to raise needed cash. Hence, the district court's grant of summary judgment in Mendell II dismissing plaintiff's cause of action based on the purpose of the merger was in error. See id. at 1067 ("[A] complaint may not properly be dismissed pursuant to Rule 12(b)(6) (or even pursuant to Rule 56) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.").
 
 II The Tax Incentive Claim
 
 33
 Mendell's second claim--that the proxy statement should have disclosed that the Loehmann family expected to receive a substantial estate tax benefit from the merger due to an enhanced blockage discount--was properly dismissed by the district court in Mendell I. 612 F.Supp. at 1553 n. 13. Although we have not expressly ruled on whether proxy solicitations must reveal incidental tax benefits that a majority shareholder expects to receive from a proposed transaction, we agree with Judge Sprizzo's reasoning that such benefits need not be disclosed. Expanding the requirements of SEC Rule 14a-9 to insist upon disclosure of incidental tax benefits--benefits that do not flow directly from the corporate transaction itself but rather from the individual shareholder's personal tax situation--goes beyond the purposes of the Rule. See Lewis v. Dansker, 357 F.Supp. 636, 642 (S.D.N.Y.1973). The practical difficulties involved in computing speculative personal tax consequences--especially since those consequences depend upon indeterminate, often difficult to predict variables--precludes any requirement that potential incidental tax benefits need be disclosed. The cases Mendell relies on are distinguishable because they involved special benefits flowing directly from the corporate transaction, and not from incidental personal tax benefits. See Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 353-54, 365-66 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); TBK Partners v. Shaw, 689 F.Supp. 693, 700-01 (W.D.Ky.1988); Valente v. PepsiCo., Inc., 454 F.Supp. 1228, 1245 (D.Del.1978).
 
 
 34
 Ordinarily, whether the failure to make such disclosure is material is a "mixed question of law and fact," in which "the underlying objective facts ... are merely the starting point for the ultimate determination...." TSC Indus. v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 2132-33, 48 L.Ed.2d 757 (1976). Summary judgment dismissing a claim alleging a material omission is granted only when to disagree on the materiality of the omission would be unreasonable. See id. at 450, 96 S.Ct. at 2133.
 
 
 35
 The facts of this case highlight the difficulties that might arise from a rule requiring disclosure in every case of personal tax benefits. After being informed of the potential for a large blockage discount from the sale of all of the family's stock, Stafford retained the investment banking house of Allen & Co. for advice respecting the size of the discount. That firm rendered an opinion that the family's block of shares was worth $6.9 million, or $14.95 per share. This amounted to a blockage discount of 28.2 percent. Allen & Co. did not give this valuation until January 31, 1981--after the issuance of the proxy statement. In September 1981, the IRS initially indicated that it would grant only an 11.2 percent discount, and in March 1982, it eventually determined the value of the stock to be $17.35, that afforded only a 16.6 percent discount. Such large discrepancies in valuing the blockage discount reveal the complexities of requiring such a disclosure in the proxy statement.
 
 
 36
 Here Stafford's failure to disclose the personal tax consequences resulting to her from the merger were speculative in nature and may not be deemed a material omission. To hold otherwise would require that major shareholders include speculative predictions of their personal finances in a proxy statement that is more likely to confuse than enlighten other stockholders. Cf. TSC Indus., 426 U.S. at 448, 96 S.Ct. at 2132 (too low a standard of materiality could cause management "to bury the shareholders in an avalanche of trivial information").
 
 III The "Handshake Agreement" Claims
 
 37
 Mendell's last two contentions on appeal concern benefits that Loehmann's chief executive, George Greenberg, received from AEA after the merger. These claims do not simply allege omissions in the proxy statement, but assert instead, affirmative misrepresentations in that document. The first claim involves the sale of LH Investors stock on favorable terms to Greenberg after the merger; the second one, an incentive package Greenberg received from AEA for remaining as Chief Executive Officer of the merged company.
 
 A. Acquisition of LH Investors Stock
 The proxy statement recited that
 
 38
 Neither Mr. Greenberg nor any other present director or officer of the Company owns beneficially or will acquire an equity or debt interest in AEA, LHI, Holdings or [LH] Investors.
 
 
 39
 LH Investors was an AEA subsidiary which in effect became the sole owner of Loehmann's. Four months after the merger Greenberg was offered the opportunity to purchase stock in LH Investors on favorable terms, which he did. Mendell alleges that this purchase was contemplated and negotiated prior to the merger contrary to the above quoted passage of the proxy statement. The district court dismissed this contention in Mendell II for insufficient supporting evidence. It relied on the testimony of the president of AEA that it was the regular policy of the company to offer stock incentives to its management. It reasoned that the sale of stock to Greenberg was as consistent with this unilateral policy as with the allegation of a pre-merger arrangement. 715 F.Supp. at 88.
 
 
 40
 We think the district court failed to consider circumstantial evidence beyond the acquisition of LH Investors stock itself. Mendell submitted a memorandum dated October 16, 1980 prepared by Ronald Kominski, then a manager for Continental Illinois National Bank and Trust Company of Chicago, recommending that the bank approve a loan to AEA for the acquisition of Loehmann's. Kominski stated in this memo that "[m]anagement, presently in place, will be retained and offered a 14% equity participation in the new corporation." (emphasis deleted). Kominski testified in his deposition that this statement regarding equity participation most probably came from someone at AEA.
 
 
 41
 Another confidential memorandum dated November 1980 was prepared by AEA and entitled "Memorandum Relative to the Purchase of Loehmann's, Inc." It contained a table styled "Return on Investment Analysis," which has columns of financial information relating to Loehmann's. At the top of the table it says "15% Growth[,] Value in Year Five $ 10x Net Operating Income." During discovery AEA produced for Mendell a second table called " 'S' 15% Growth Return on Investment Analysis." Its heading stated "Value in Year Five $ 10x Assuming Interest of 15 1/2% and $31/Share Price." This second table also had columns of financial information under almost identical headings and containing almost identical figures as the first table. But in the second table for "S" company, there is a line that reads "S's Mgmt $ 5%" under a column indicating percentages of stock. Mendell claims that "S" company was in reality Loehmann's and that the "S" table shows that it was planned that Loehmann's management would receive common stock equal to 5 percent of the capitalization of LH Investors.
 
 
 42
 When questioned about the table for "S" company at his deposition, Carl Hess, AEA's president testified that he did not know which company it referred to, but that it did not refer to Loehmann's. Hess was unable to explain why the two tables were nearly identical. Nor could he explain why AEA had produced the document in response to Mendell's discovery request if it did not refer to Loehmann's. A reasonable juror could disbelieve Hess' testimony, find that the "S" table referred to Loehmann's and that it indicated that AEA had planned prior to the merger to give Loehmann's management, including Greenberg, shares of stock in LH Investors.
 
 
 43
 If Mendell is able to persuade a jury that AEA had in fact planned prior to issuance of the proxy statements to give Greenberg stock, and that Greenberg had negotiated the arrangement, then the statement that neither Greenberg nor any other officer "will acquire an equity ... interest in ... [LH] Investors, [Inc.]" was false and misleading under Rule 14a-9. Since a jury could reasonably infer that such an agreement took place in light of the table for "S" company and the testimony of Kominski, summary judgment dismissing the claimed failure to disclose the acquisition of LH Investors stock was improper. See Saxe v. E.F. Hutton & Co., 789 F.2d 105, 111 (2d Cir.1986); Hahn v. Breed, 606 F.Supp. 1557, 1559-61 (S.D.N.Y.1985).
 
 B. The Incentive Package
 
 44
 Mendell also alleged that Greenberg and AEA had come to an agreement prior to the merger regarding an "incentive package" Greenberg would receive after the merger, and that the proxy statement falsely represented that no such agreement had been reached. The proxy statement read, in pertinent part:
 
 
 45
 Mr. Greenberg presently has an employment contract with the Company providing for his employment as President and Chief Executive Officer until July, 1988 ... at a base salary of $200,000 per year plus a bonus based on the Company's net earnings.... The contract will remain in effect after the [Merger]. It is also anticipated that following the consummation of the Merger, additional incentive arrangements may be established for Mr. Greenberg and other key employees which may consist of employment agreements, stock appreciation rights, performance related awards or other types of compensation. It is not expected that the exact nature and details of these arrangements will be determined until several months after the [Merger].
 
 
 46
 On March 10, 1981, two months after the merger, AEA first proposed a "Management Incentive Plan," that provided a new incentive plan for the company's management, including Greenberg. This proposal was rejected and further negotiations ensued. On May 26, 1981 AEA presented a second proposal that was accepted; part C of this proposal covered Greenberg exclusively. It increased his base salary $50,000, altered the formula by which his annual bonus would be determined, and allowed him to purchase the just discussed 8,000 shares of LH Investors stock.
 
 
 47
 Greenberg admitted that prior to the merger he discussed with AEA his concern that the remaining management of Loehmann's receive some type of incentive plan after the merger and that compensation and other benefits would be "certainly not less than what [they] got" prior to the merger. Mendell insists that this admission, the fact that an initial draft of the proxy statement which read that Greenberg "will" receive additional incentive arrangements was revised to read that Greenberg "may" receive such additional arrangements, and the fact that AEA prepared a memorandum in November 1980 estimating a cost of $3,304,000 annually for an incentive plan for Loehmann's management, provides sufficient proof to create a genuine issue of material fact. We disagree.
 
 
 48
 Even assuming that the proof submitted may have been sufficient to raise the question of whether AEA and Greenberg had agreed prior to the merger that certain additional incentives would definitely follow its consummation, the proxy statement adequately revealed the probability of this occurrence to the shareholders. While it is true that the proxy statement used the word "may" rather than "will," a reasonable investor would still have been on notice that additional incentives were most likely and should have been anticipated. This is not a case where the additional incentives were so exorbitant that a reasonable investor would have been shocked upon learning of them. Other than the purchase of 8,000 shares of LH Investors stock for $100 per share, Greenberg's additional incentives amounted to a pay raise of 25 percent and an alteration in the formula for computing his annual bonuses to exclude--in determining the company's adjusted earnings--the debt the company had incurred in connection with the merger.
 
 
 49
 Thus, the proxy statement adequately gave notice of AEA's and Greenberg's intentions to make a modest adjustment to Greenberg's compensation, and any omission of an actual agreement as to the exact terms of Greenberg's compensation would not have "significantly altered the 'total mix' of information made available." TSC Indus., 426 U.S. at 449, 96 S.Ct. at 2132. This claim was therefore properly dismissed.
 
 IV Defendants' Cross-Appeal
 
 50
 Defendants cross-appeal from the denial of their motion for sanctions against plaintiff under Fed.R.Civ.P. 11, and from that part of the district court's order in Mendell I that denied defendants' motion to dismiss the amended complaint for failure to state a claim for relief, to the extent the order merged into the judgment in Mendell II. We agree with the district court that even as to those claims properly dismissed by summary judgment, plaintiff's arguments were not "so lacking in a colorable basis that Rule 11 sanctions are warranted." Mendell II, 715 F.Supp. at 90. In light of our decision to remand the case to the district court for trial, defendants' appeal of the order in Mendell I is moot.
 
 CONCLUSION
 
 51
 Accordingly, we reverse the grant of summary judgment dismissing plaintiff's causes of action regarding the omission of facts regarding the merger in the proxy material and the purchase of LH Investors stock by defendant Greenberg after the merger. Both of these claims raise genuine issues of material fact and they are therefore remanded to the district court for trial. With respect to plaintiff's other causes of action that were dismissed by the district court, and defendants' cross-appeal on the denial of Rule 11 sanctions and from the district court's order in Mendell I, the orders of the district court are affirmed.
 
 
 52
 Affirmed, in part, and reversed and remanded, in part.
 
 
 53
 VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:
 
 
 54
 Because the latest changes in the majority opinion were made after the majority and dissenting slip opinions were circulated, the changes readily are discernible to those who received the original slips. Accordingly, rather than address the majority's alterations in piecemeal fashion, I have eliminated the first paragraphs of my already-filed dissent and substitute therefor the following few paragraphs as a preamble to this refiled dissent.
 
 
 55
 To set the stage for this preamble, I would remind the reader that the proxy statement at issue herein disclosed to all shareholders that "[p]rior to her death in March, 1980, Mrs. Loehmann and other representatives of her family's interests determined that it would be in the best interests of her family to consider a sale of the Company Common Stock held by her family"; that negotiations for such sale were commenced prior to Mrs. Loehmann's death and continued thereafter by her family interests until they culminated in the sale at issue herein. Plaintiff contends that this informative disclosure of the Loehmann family's desire to sell was not enough; that the shareholders should have been informed that the Loehmann family had such an urgent need for cash to pay estate taxes, they were willing to sell their stock at a substantial loss to raise the money. Judge Sprizzo, relying on the deferred payment provisions of 26 U.S.C. Sec. 6166, held that no such need existed. 715 F.Supp. at 86-87. As will appear later in this opinion, I agree. In their latest additions to the majority opinion, my colleagues state that a shareholder informed of the substantial tax liability "could deduce that the Loehmann family desired a 'quick sale' for estate tax purposes"; that "this information could lead the stockholder to infer that the majority stockholder's urgent need for cash, coupled with the control such a stockholder is able to exercise over the affairs of the company,[1] had caused the Board of Directors to endorse a sale below the stock's value, the financial appraisal contained in the proxy statement notwithstanding"; that "a reasonable shareholder--fully informed of the majority shareholder's urgent need for cash--could consider that fact important in valuing the stock" (emphasis supplied).
 
 
 56
 Although the issues raised by the majority's use of the word "could" are discussed generally in the portions of this opinion that preceded the majority's latest amendments, this is an appropriate time to point out, at least in preliminary form, that, as used in this manner, the crucial word should not be "could", but instead should be "would". The word "could" expresses a contingency that may be possible and nothing more. United States Casualty Co. v. Kelly, 78 Ga.App. 112, 116, 50 S.E.2d 238 (1948). Like the word "might", the word "could" is not synonymous with the word "would". Gehrig v. Chicago & Alton Ry. Co., 201 Ill.App. 287, 293 (1916).
 
 
 57
 Assuming that, despite the speculation inherent in the use of the word "could", its use would be sufficient to defeat an ordinary motion for summary judgment, but see Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 42 (2d Cir.1986), it is not sufficient to demonstrate the Securities Exchange Act violation alleged herein. Under that Act, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (emphasis supplied); see also Basic, Inc. v. Levinson, 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988).
 
 
 58
 I cannot conclude this preamble without commenting upon my colleague's continued heavy-handed attempts to distinguish this case from Rodman v. Grant Foundation, 608 F.2d 64 (2d Cir.1979). In this case, as in Rodman, "the proposed actions of the company and their effect on stockholdings were fully disclosed." Id. at 71. Moreover, the Loehmann family's desire to dispose of its stock, if not as self-evident as the desire to purchase in Rodman, was disclosed in the proxy statement itself. Nowhere is the majority's misstatement of the law more evident than in its misuse of a partial quote from this court's opinion in Rodman:
 
 
 59
 Applying that test, there was enough evidence here for a rational jury to reach the conclusion that the omitted information "might have induced shareholders to vote against the [merger]," Rodman, 608 F.2d at 71, making its omission a material one for securities law purposes.
 
 
 60
 Judge Friendly rejected this exposition of the law long before Rodman, when he said:
 
 
 61
 While the difference between "might" and "would" may seem gossamer, the former is too suggestive of mere possibility, however unlikely.
 
 
 62
 Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1302 (2d Cir.1973).
 
 
 63
 Now I return to the remainder of my dissent as it was filed and circulated on November 1, 1990.
 
 The Loehmann Family's Motivation
 
 64
 On several occasions, the Supreme Court and this court have emphasized the desirability of deterring securities law actions involving nondisclosure that are brought solely for their potential settlement value. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 210-11 n. 30, 96 S.Ct. 1375, 1389 n. 30, 47 L.Ed.2d 668 (1976); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 740-41, 95 S.Ct. 1917, 1927-28, 44 L.Ed.2d 539 (1975); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 114-15 (2d Cir.1982). The sentiments expressed in these holdings make the following comments by Judge Sprizzo to plaintiff's counsel during the argument that preceded the Judge's grant of summary judgment herein an appropriate backdrop for the discussion that follows in this opinion:
 
 
 65
 I know that for the past five years you and Mr. Kaufman have wanted to expand this case very far, but I have limited this case and I am going to continue to limit this case to the issues resolved by my prior decision. I tell you as a matter of law that I think I may have been wrong in even letting you go this far. As a matter of law, I have difficulty with the notion that any stockholder is entitled to rely as a matter of law upon what a majority stockholder does or does not do. But I have given you the benefit of the doubt on that for the sake of an expeditious appeal and one appeal. I think you are probably wrong on the law.
 
 
 66
 * * * * * *
 
 
 67
 I have had a lot of patience in this case. The time has come for this case to go on its appellate road. I am tired of these loose allegations. We have been going through this for four years. Mr. Kaufman argued a motion before me four years ago in which he was throwing out facts in the argument which weren't in his brief and weren't anywhere. I have had a lot of patience. Now the time has come to be specific.
 
 
 68
 * * * * * *
 
 
 69
 Where is your affirmative evidence that the estate had a [sic] urgent need for cash and Mrs. Stafford knew it? The more I think about this case, the more I become convinced as a matter of law it is not material.
 
 
 70
 * * * * * *
 
 
 71
 With respect to the other question of whether there were material misrepresentations with respect to the existence or nonexistence of an estate tax motive or an urgent need for cash, which is one of the issues left open by prior decision, I say at the outset that I am not entirely sure that that is material. I at least in terms of the prior motion found that it might be and that it might raise a jury question. I am not sure that is correct. I am not so sure that the motives of the majority shareholder or the reasons why they sell or even the tax circumstances surrounding their sale are the kind of thing that a reasonable shareholder should be entitled to rely upon as a matter of law. So I have a serious question as to whether that circumstance is material as a matter of law.
 
 
 72
 * * * * * *
 
 
 73
 It seems to me that it would be a rather large leap to turn every Section 14 case into a tax case and decide whether the tax consequences did or did not justify the decision of the majority shareholder to sell. I think it would be an unwarranted extension of the securities laws. If it is going to happen, it should happen at a higher level than mine, as I have indicated in a prior case.
 
 
 74
 I will say this much: There is no proof in this record that the price paid for the stock was in any way inadequate or inappropriate or below the value of the stock. The only inference we are trying to draw about some lack of value here is the fact that the majority shareholder might have been involved in some kind of a fire-sale mentality which influenced the other shareholders. I have very serious questions whether a shareholder can reasonably rely upon what a majority shareholder does anyway, because it seems to me he as a matter of policy should make his own decision based upon what he thinks he ought to do, and the law should not reward him for relying upon what a majority shareholder does. In any event, there is no evidence in this record which will support a rational jury finding that there was such an urgent need for cash that the decision of the majority shareholder to sell was in effect sufficient to draw an inference that she was willing to sell at less than the stock's value.
 
 
 75
 I think the time has come to grant summary judgment in this case.
 
 
 76
 * * * * * *
 
 
 77
 The case has been around for four or five years. It is time to test its legal sufficiency in the Court of Appeals.
 
 
 78
 Because our review of the district court's grant of summary judgment is plenary, we are not bound by the above-quoted language. Burtnieks v. City of New York, 716 F.2d 982, 985 (2d Cir.1983). However, we are required to pass upon the merits of the district court's decision in accordance with the principles laid down by the Supreme Court in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), and Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986), and in prior decisions of our own court, e.g., Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting Sys., Inc., 844 F.2d 955, 959 (2d Cir.), cert. denied, 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988). These cases hold that once a party moves for summary judgment on the ground that there is no material issue for trial, his opponent must go beyond the pleadings, and, by reference to affidavits, depositions, admissions, and answers to interrogatories, designate specific facts showing that there is a genuine material issue for trial. The following review of pertinent law points to only one conclusion--whether alleged tax problems in the Anita Loehmann estate were a motivating factor in the Loehmann family's decision to sell their stock was not a genuine material issue for trial.
 
 
 79
 Perhaps the first case in this circuit to interpret the antifraud provisions of section 14 was Doyle v. Milton, 73 F.Supp. 281 (S.D.N.Y.1947). The court held there that motivation, not otherwise unlawful, is not a required disclosure under the Act. Id. at 286. From that early date to the present time, our district judges consistently have reasoned in the same manner. See, e.g.:
 
 
 80
 Stedman v. Storer, 308 F.Supp. 881, 887 (S.D.N.Y.1969) (no material omission in directors' failure to discover and adjudge faithless motives for their actions and announce the same);
 
 
 81
 Lewis v. Dansker, 357 F.Supp. 636, 643-45 (S.D.N.Y.1973) (no violation of section 14(a) for failure of proxy statement to describe defendant's potential tax benefits), modified on other grounds, 68 F.R.D. 184 (S.D.N.Y.1974);
 
 
 82
 Lewis v. Oppenheimer & Co., 481 F.Supp. 1199, 1206 (S.D.N.Y.1979) ("The income tax situation of each stockholder is personal business, and absent injury to the corporation, is irrelevant to damage claims under the federal securities laws.");
 
 
 83
 Gluck v. Agemian, 495 F.Supp. 1209, 1214 (S.D.N.Y.1980) (disclosure of subjective motive not required under the federal securities law);
 
 
 84
 Chock Full O'Nuts Corp. v. Finkelstein, 548 F.Supp. 212, 218 (S.D.N.Y.1982) ("Failure to disclose subjective interests of a sort obvious to the reasonable investor is not a violation of the disclosure requirements of the federal securities laws so long as the relevant underlying facts are disclosed.");
 
 
 85
 Koppel v. Wien, 575 F.Supp. 960, 967 (S.D.N.Y.1983) ("no federal securities law duty to disclose one's motives"), rev'd and remanded on other grounds, 743 F.2d 129 (2d Cir.1984);
 
 
 86
 Hecco Ventures v. Avalon Energy Corp., 606 F.Supp. 512, 519 (S.D.N.Y.1985) ("[E]ven if the purported ill motives of 'locking up' and entrenching Deltec's control lay behind the proposals, there would be no resulting disclosure duty.");
 
 
 87
 Lewis v. Potlatch Corp., 716 F.Supp. 807, 809 (S.D.N.Y.1989) (directors not required to disclose that motive for proposed voting rights amendment was to entrench management).
 
 
 88
 Most of the more recent district court opinions have cited this court's decision in Rodman v. Grant Foundation, supra, 608 F.2d 64, as authority for their holdings. See Lewis v. Potlatch Corp., supra, 716 F.Supp. at 809; Hecco, supra, 606 F.Supp. at 519; Chock Full O'Nuts, supra, 548 F.Supp. at 218; Gluck, supra, 495 F.Supp. at 1213-16. We held in Rodman that the failure of a proxy statement to disclose that the repurchase of outstanding corporate stock was for the purpose of entrenching management in control was not a violation of section 14(a). We said that, in the absence of some ulterior wrongful design hinging upon entrenchment, the corporate directors were not required to state the motivation for the purchases. Id. at 71. Among the cases that we cited in support of this proposition were Doyle v. Milton, supra, 73 F.Supp. 281; Stedman v. Storer, supra, 308 F.Supp. 881; Golub v. PPD Corp., 576 F.2d 759 (8th Cir.1978); and Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir.1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). In Crane, 419 F.2d at 795, we quoted with approval the statement of the district court that "[t]he securities laws are concerned with the facts presented to the stockholders, not with the motives underlying these facts."
 
 
 89
 In cases subsequent to Rodman, we have emphasized that the Securities Exchange Act's ban on manipulation is intended to prohibit conduct that artificially and misleadingly affects market activity; it is not intended to provide a cause of action for breaches of fiduciary duty, corporate mismanagement or self-serving reasons for managerial acts. "The disclosure required by the Act," we said, "is not a rite of confession or exercise in common law pleading." Data Probe Acquisition Corp. v. Datatab, Inc., 722 F.2d 1, 5-6 (2d Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984).
 
 
 90
 In Field v. Trump, 850 F.2d 938, 947 (2d Cir.1988), cert. denied, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989), we cited Data Probe, supra, for the proposition that we will not "embark ... on a course leading to a federal common law of fiduciary obligations." We also quoted Maldonado v. Flynn, 597 F.2d 789, 796 (2d Cir.1979), for the proposition that section 14(a) does not provide a remedy for "failure to disclose an alleged ulterior motive for a fully described corporation action." 850 F.2d at 947.
 
 
 91
 The Second Circuit is not unique in these holdings. See, e.g.:
 
 
 92
 Lessler v. Little, 857 F.2d 866, 875 (1st Cir.1988) (defendants not required to disclose "true motivation" in selling company assets), cert. denied, 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989);
 
 
 93
 Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir.1978) (defendants not liable for failure to disclose "true purpose" behind their activities);
 
 
 94
 Ward v. Succession of Freeman, 854 F.2d 780, 791 (5th Cir.1988) ("Case law clearly holds that a defendant's motive is not a material 'fact.' "), cert. denied, 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989);
 
 
 95
 Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Ins. Co., 606 F.2d 602, 610 (5th Cir.) (failure of controlling shareholder or corporate official to disclose his motives in entering a transaction does not violate section 10b-5), cert. denied, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980);
 
 
 96
 Panter v. Marshall Field & Co., 646 F.2d 271, 288 (7th Cir.) (defendants not required to reveal their "impure motives" for entering an allegedly improper transaction), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981);
 
 
 97
 Golub v. PPD Corp., supra, 576 F.2d 759, 765 (8th Cir.1978) (defendants not required to disclose the "true motivation" of management in selling company assets);
 
 
 98
 Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1221 (9th Cir.1980) (corporate officers under no duty to disclose "precise motive" or purpose for engaging in particular course of action so long as motive is not "manipulative or deceptive").
 
 
 99
 Judge Cardamone's statements (supra, at 670) that Mendell "believed" that Mrs. Stafford had a conflict of interest and that Mendell "claims" that Mrs. Stafford had the ability to persuade other directors and shareholders to approve the transaction are not "specific facts" showing that there is a genuine issue for trial as required by Fed.R.Civ.P. 56(e). Neither is the majority's statement (supra, at 676) that "[f]urther questions of fact exist regarding whether Stafford's influence on the board of directors was so great that the merger proposal was adopted in order to allow the Loehmanns to raise needed cash." This action has been pending since January 5, 1981. Plaintiff has deposed over seventeen witnesses, seven of whom were company directors. In addition to Mrs. Stafford, six of the directors owned company stock. One owned 171,743 shares; others owned respectively 40,610, 1,170, 1,000, and 100 shares. All of them were knowledgeable business people, and all denied being influenced in any way by the estate tax problems of the Loehmann family. All of them stood to sustain substantial losses if their stock was undervalued in the merger. In Matsushita Elec. Indus., supra, 475 U.S. at 587, 106 S.Ct. at 1356, the Court said that "if the factual context renders [plaintiff's] claim implausible--if the claim is one that simply makes no economic sense--[plaintiff] must come forward with more persuasive evidence to support [his] claim than would otherwise be necessary." In the instant case, plaintiff has produced no evidence at all that the knowledgeable and experienced members of the Loehmann board were influenced to take substantial losses on their own investments in order to assist the Loehmann family with its alleged estate tax problems. Indeed, plaintiff's claim against the individual directors is based primarily upon their alleged negligence in not knowing why the Loehmann family wanted to sell its stock. See Plaintiff-Appellant's Reply Brief at 19.
 
 
 100
 Judge Cardamone's reliance upon SEC v. Parklane Hosiery Co., 558 F.2d 1083 (2d Cir.1977), is misplaced. At the outset, Judge Cardamone neglects to note that, unlike the instant case, Parklane was a Commission action for an injunction, not a private action for damages. See id. at 1088. Moreover, my colleague's summary reference to Parklane omits several important and distinguishing facts. Perhaps this best can be illustrated by reference to District Judge Duffy's opinion in Parklane, 422 F.Supp. 477 (S.D.N.Y.1976). This shows that Herbert Somekh, the owner of a controlling interest in Parklane, decided to have the company go private by purchasing the publicly owned shares. The SEC contended that Somekh's true intention in proposing the merger was to "bail out his personal financial situation." Id. at 482. Judge Duffy found that this was Somekh's "overriding purpose." Id. We agreed. 558 F.2d at 1086. Moreover, said Judge Duffy, "There is not so much as a hint of Somekh's huge debts in the proxy statement." 422 F.Supp. at 482. Again we agreed. 558 F.2d at 1086. As correctly described by Judge Pollack in Lewis v. Oppenheimer, supra, 481 F.Supp. at 1206, Somekh's conduct was a "flagrant misappropriation of corporate assets for personal use."
 
 
 101
 Judge Cardamone also fails to note that Somekh retained an outside financial house to appraise the Parklane shares and misled the appraisers as to the facts surrounding the proposed merger.
 
 
 102
 Russ [vice-president of the appraising company] testified that at the time he conducted the appraisal he was not told and was not aware of Somekh's plans to use nearly $1 million of corporate assets to reduce his personal indebtedness. He was equally unaware of Somekh's intention to sell real property to the corporation. At no time was Russ, or anyone else at his firm, informed of the negotiations with the Federal Reserve Board with respect to cancellation of the leasehold at Nassau and John Streets.
 
 
 103
 422 F.Supp. at 483-84. By referring to the presumably honest appraisal in the proxy statement, Somekh was not simply failing to disclose facts; he was intentionally deceiving the shareholders concerning the soundness and validity of the appraisal. Somekh's looting of Parklane's treasury is a far cry from the conduct complained of in the instant case.
 
 
 104
 Because the overwhelming weight of authority cited herein establishes as a matter of law that section 14(e) was not violated by the failure of the Loehmann Company's Proxy Statement to disclose the Loehmann family's estate tax situation, there is no compelling need to discuss the merits of plaintiff's claims concerning the family's alleged tax problems. However, because I fully agree with Judge Sprizzo that plaintiff's claims on this issue are completely without merit, I would be remiss if I did not say so.
 
 
 105
 Mendell alleges in his complaint that it was "necessary for the defendant Stafford and the Loehmann family to make a prompt sale of their stock in Loehmann's for tax reasons and other reasons personal to them"; that they "were faced with the urgent necessity of raising large amounts of cash to pay estate taxes." Mendell makes the same argument in his brief: "LOEHMANN'S WAS BEING SOLD BECAUSE THE LOEHMANN FAMILY HAD AN URGENT NEED FOR CASH TO PAY ESTATE TAXES AND ... PRICE WAS A SUBORDINATE CONSIDERATION." Plaintiff-Appellant's Brief at 27.
 
 
 106
 Simple mathematics belie this assertion. The stock's book value was approximately $13.50 per share. During 1980, the stock traded on the American Stock Exchange at an average price of around 23 1/2. The Loehmann family owned 786,812 shares which it agreed to sell for $31.30 a share. As Judge Sprizzo noted, plaintiff has come forward with no proof that the stock was worth more than $31.30 a share. However, if the $31.30 represented an undervaluation of only $1.27 a share, the total loss to the Loehmann family from the sale would be $1 million. If the undervaluation was $5.00 a share, the Loehmann family's loss would be $3,934,060. If the undervaluation was $10.00 a share, their loss would be $7,868,120. If, as Mendell alleges without any basis in his complaint, the undervaluation was at least $14.00 a share, the Loehmann family's loss would be at least $11,015,368.[2] Mendell's allegation that price was a "SUBORDINATE CONSIDERATION" is ridiculous on its face.
 
 
 107
 The Proxy Statement disclosed that Charles Loehmann, the founder of the Company and Chairman of the Board, died in 1977 and that after his death his surviving family felt it would be in their best interest to dispose of the stock that he had owned. The Proxy Statement also informed shareholders that the Loehmann family's feelings in this regard already had been disclosed publicly in filings with the SEC.
 
 
 108
 As frequently happens, see Sheffield, Liquidity Problems of Owners of Closely Held Corporations: Relief Provided by Sections 303 and 6166, 38 U.Fla.L.Rev. 787, 787-88 (1986), the estates of both Charles Loehmann and his widow, Anita Loehmann, did not have sufficient liquid assets to pay all of the estate taxes at once. However, because of the estates' substantial holdings in Loehmann's Inc., they were entitled to the benefits of section 6166 of the Internal Revenue Code, 26 U.S.C. Sec. 6166. Prior to the enactment of section 6166, estates such as those of Mr. and Mrs. Loehmann could raise money for payment of estate taxes either by selling stock or by borrowing from private institutions, often a difficult and expensive proposition. Section 6166 was enacted for the specific purpose of alleviating this need. Priv.Ltr.Rul. 8213075 (Dec. 30, 1981), reprinted in 6 Modern Estate Planning, App. 1289, 1292 (1988). Under section 6166(a), a decedent's executor may elect to pay the estate tax in up to ten installments, the first of which is not due for five years. Although interest must be paid yearly on the unpaid amount of the tax, the interest rate on a substantial portion of the unpaid principal is only 4 percent. 26 U.S.C. Sec. 6601(j). The practical effect of a section 6166 election is that the government, rather than a private institution, becomes the lending party, and it loans at an advantageous rate of interest that is tax deductible. See Estate of Bahr v. Comm'n, 68 T.C. 74, 82 (1977). Congress felt that the "5-year deferral period plus the reduced interest rate ... should in most cases give the business time to generate sufficient funds to pay the estate tax and interest thereon without the business having to be sold to satisfy the estate tax liability...." H.R.Rep. 1380, 94th Cong., 2d Sess. 32 (1976), 1976-3 (Vol. 3) C.B. 735, 766 (quoted in Priv.Ltr.Rul. 8446009 (July 12, 1984), reprinted in 6 Modern Estate Planning, supra, App. 1296.3, at 1296.4).
 
 
 109
 Utilization of the benefits of section 6166 is not a desperation measure, as Mendell would have us believe. One writer suggests that the section can be utilized by an estate without a liquidation problem and therefore should be considered as a possible estate planning tool. Sheffield, supra, 38 U.Fla.L.Rev. at 809. Attorney James Pressly, a trust and estate specialist who advised the Loehmann family on estate matters, testified unequivocally on deposition as follows:
 
 
 110
 Q. .... Do you have an understanding as to whether at the time of the merger the Loehmann family shareholders promised to make a sale of their Loehmann stock because they urgently needed money to pay estate taxes?
 
 
 111
 A. They did not urgently need to raise money to pay estate taxes.
 
 
 112
 Q. Is that because of the availability of various deferral techniques or borrowing of money?
 
 
 113
 A. Yes.
 
 I agree.[3]
 
 114
 Before liability can be predicated upon the omission of an alleged fact from a proxy statement, there must be a showing that the alleged fact is true. United States v. Matthews, 787 F.2d 38, 45 (2d Cir.1986). The disclosure must be of "hard facts which definitely affect a company's financial prospect." Reiss v. Pan American World Airways, Inc., 711 F.2d 11, 14 (2d Cir.1983). Given the ready availability of section 6166, Mendell's contention that the Loehmanns were required to sell their stock in order to pay estate taxes is simply untrue. Assuming that a jury was given the horrendous task of measuring the alleged loss to the Loehmann family from selling their 786,812 shares of stock at a yet to be proven undervalued price against the alleged tax benefits resulting from the sale (which my colleagues say may not be considered), the most favorable verdict that Mendell could hope to secure would be that the sale was more desirable financially to the Loehmanns than a section 6166 tax deferment. Assuming further that in preparing its Proxy Statement the board could have summarized with even some degree of accuracy the financial pros and cons of the several possible ways of handling the Loehmann family's estate taxes, a matter concerning which the writer and his colleagues obviously disagree, it is doubtful indeed that such summary would have any meaning whatever to the average shareholder. He would simply be buried "in an avalanche of trivial information--a result that is hardly conducive to informed decisionmaking." TSC Indus., Inc. v. Northway, Inc., supra, 426 U.S. at 448-49, 96 S.Ct. at 2132. Every shareholder with common sense knew that, when the Loehmanns offered their stock for sale at $31.30 a share, the sale of the stock was more desirable to them than its retention.
 
 
 115
 "The 'Handshake Agreement' Claims"
 
 
 116
 It is conceded by all concerned that defendant Greenberg, the President, Chief Executive Officer and a Director of Loehmann's Inc., was one of the most capable chain store executives in the country. His annual salary was $200,000, and in addition he was entitled to substantial fringe benefits. The Proxy Statement disclosed that Greenberg's employment contract would remain in effect after the merger, and continued:
 
 
 117
 It is also anticipated that following the consummation of the Merger, additional incentive arrangements may be established for Mr. Greenberg and other key employees which may consist of employment agreements, stock appreciation rights, performance related awards or other types of compensation. It is not expected that the exact nature and details of these arrangements will be determined until several months after the Effective Time.
 
 
 118
 The Proxy Statement also provided that each share of the Company's stock "shall, by virtue of the Merger, automatically be deemed for all purposes to represent only the right of the holder to receive $31.30 per share in cash or to perfect any rights of appraisal which a shareholder may have as a dissenting shareholder and shall not represent shares of the Company as the surviving corporation or of any other party to the Merger Agreement." It also provided that "[n]either Mr. Greenberg nor any other present director or officer of the Company owns beneficially or will acquire an equity or debt interest" in the merging companies. This latter assertion cannot reasonably be construed to mean that these individuals never would acquire an equity or debt interest in AEA, LHI, LH Holdings or LH Investors. The more sensible construction is that, as part of the merger transaction itself, the officers and directors would receive only cash for their stock and would not acquire an equity interest in the merging companies.
 
 
 119
 After the merger was consummated, Greenberg entered into a twelve-page contract with LH Investors, Inc. for the purchase of 8,000 shares of "Class A stock" of LH Investors, Inc. on what appears to have been favorable terms. Mendell contends, in substance, that this complicated twelve-page contract was simply a formalization of a pre-merger "Handshake Agreement" and that Loehmann's Proxy Statement was manipulative and deceptive under section 14(e) for failure to disclose the existence of the Handshake Agreement. I disagree.
 
 
 120
 To merit recognition in the Proxy Statement as an enforceable contract, the so-called "Handshake Agreement" must in fact have been an enforceable contract. The word "agreement" is not necessarily synonymous with the word "contract." Hunter v. Anderson, 74 F.Supp. 721, 722 (N.D.Tex.1947). It "contains no implication that legal consequences are or are not produced." Restatement (Second) of Contracts Sec. 3 Comment "a"; see also Williston on Contracts Sec. 2 at 6-7 (3d ed.); 3 C.J.S. Agreement at 514-15. Although Mendell was permitted to conduct an exhaustive fishing expedition, he has not identified the parties to the so-called "Handshake Agreement", and no enforceable terms of that Agreement have been disclosed. As a matter of fact, every person who might have been a party to the alleged "Handshake Agreement" has denied under oath that any conversations relating to Greenberg's future interests in the merged Company took place.
 
 
 121
 My colleagues say, however, that a reasonable juror could conclude "that AEA had planned prior to the merger to give Loehmann's management, including Greenberg, shares of stock in LH Investors." Assuming for the sake of argument that this is so, such planning certainly does not constitute a handshake agreement. Moreover, the so-called "planning" would fall squarely within the Proxy Statement's provision that it is "anticipated that following the consummation of the Merger, additional incentive arrangements may be established for Mr. Greenberg and other key employees which may consist of employment agreements, stock appreciation rights, performance related awards or other types of compensation." A stronger statement than this concerning Greenberg's lawful expectations might itself have constituted a violation of section 14(e). See Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2d Cir.1969); United States v. Matthews, supra, 787 F.2d at 45; Reiss v. Pan American World Airways, supra, 711 F.2d at 14.
 
 
 122
 In my opinion, this case epitomizes the fears expressed by Justice Rehnquist in Blue Chip Stamps, supra, 421 U.S. at 740, 95 S.Ct. at 1927, where he said thatin the field of federal securities laws governing disclosure of information even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment.
 
 
 123
 I would dismiss the complaint in toto.
 
 
 
 [1]
 In view of the clearly established fact that the Loehmann family had little control over corporate management and had even considered conducting a proxy fight to oust it, my colleagues's use of the phrase "such a stockholder is able to exercise" carries with it a misleading connotation that, I like to think, my colleagues did not intend
 
 
 [2]
 Similar computations can be made with regard to the various corporate directors whose holdings have been described above
 
 
 [3]
 Pressly's October 22, 1980 letter is not to the contrary. In this letter, Pressly discussed the possible pros and cons of filing Anita Loehmann's estate tax return (and opting for section 6166 payment) prior to the January 2, 1981 scheduled closing date for the merger. Because the IRS granted an extension of time for the filing until after the merger, the discussion became moot